**Sonia Eladia Acosta SALDIVAR,
Petitioner,**

v.

**Rick RODELA, Respondent.**

**No. EP–12–CV–00076–DCG.**

United States District Court,
W.D. Texas,
El Paso Division.

June 22, 2012.

---

Pamela M. Brown, Texas Riogrande Legal Aid, Inc., Weslaco, TX, for Petitioner.

James Darrell Lucas, Attorney at Law, Marlene Gonzalez, Law Office Of Marlene Gonzalez, PLLC, El Paso, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER

DAVID C. GUADERRAMA, District Judge.

On this day, the Court considered Petitioner Sonia Eladia Acosta Saldivar's ("Acosta") "Verified Complaint/Petition for Return of Child to Petitioner" [ECF No. 1], filed on March 5, 2012, in the above-captioned cause. Therein, she claims that Respondent Erick Rodela ("Rodela") is wrongfully retaining the parties' minor son, D.I.R.A., in the United States, in violation of the Hague Convention on the Civil Aspects of International Child Abduction, 25 Oct. 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501 ("Hague Convention" or "Convention"), implemented in the United States by the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610 ("ICARA"). As relief, she seeks immediate return of D.I.R.A. to Mexico. On June 8, 2012, the Court held a bench trial, at which each party appeared in person and by counsel. After due consideration and for the reasons that follow, the Court is of the opinion that Acosta's request for the return of the child should be granted.

## I. JURISDICTION AND VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this matter arises under the Convention and ICARA, the implementing legislation. Pursuant to ICARA, state and federal district courts have concurrent original jurisdiction over actions arising under the Con-

vention. 42 U.S.C. § 11603(a). A Hague petitioner, however, is "free to choose between state or federal court." *Yang v. Tsui*, 416 F.3d 199, 203 (3rd Cir.2005). Venue is proper because this Court "is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed," which was El Paso County, Texas, within the jurisdiction of the United States District Court for the Western District of Texas, El Paso Division. *See* 42 U.S.C. § 11603(b).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having carefully considered the pleadings on file, the evidence on the record, the arguments of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### A. Findings of Fact [1]

1. D.I.R.A. is the only child of Acosta and Rodela. Acosta is a Mexican citizen and holds a United States permanent resident card. She has lived most of her life in Ciudad Juarez,[2] Chihuahua, Mexico. Rodela, who is an American citizen, grew up in Juarez, at least until he was twelve years old; he now lives in El Paso, Texas.

2. In June 2002, Acosta and Rodela got married. In August of that year, they were married by a church.

3. Prior to their marriage, they lived in Juarez, but moved to the United States when they got married by the church. Following their marriage, they lived in El Paso for a few months and then moved back to Juarez around March 2003.

4. In June 2004, D.I.R.A. was born at a hospital in El Paso, Texas.

5. At the time of the child's birth, the parties were living in a rented home in Juarez. After his birth, Acosta, Rodela, and the child stayed in El Paso for a few days—not more than two months by Rodela's account—long enough to allow the mother to recuperate. Thereafter, Acosta and Rodela moved back to Juarez with the child.

6. Once in Juarez, Acosta, Rodela, and D.I.R.A. lived in multiple rented homes, until sometime in 2007, when Rodela and Acosta purchased a house there. The house is located on a street across from and in front of the house of Maria del Rocio Acosta Saldivar, Petitioner's sister.

7. The family lived together in the purchased house until October 2010, when Rodela and Acosta separated and he moved to El Paso. Since their separation, D.I.R.A. has lived with his mother in that house until his removal to the United States in January 2012. Acosta continues to live there.

8. After the parties' separation in 2010 and prior to D.I.R.A.'s removal in January 2012, D.I.R.A. spent weekends with his father in El Paso. On occasion, the father visited the child in Juarez during weekdays after his school. During his school-break in summer 2011, D.I.R.A. stayed with

---

**1.** To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

**2.** Ciudad Juarez (or Juarez, as commonly known) and El Paso are located next to each other on the border between the United States of America and the United States of Mexico. Together they are often referred to as "borderplex."

his father in El Paso for three to four weeks.

9. On August 10, 2011, Rodela filed a petition for divorce in the 388th Judicial District Court of Texas in El Paso. In his petition, he also sought sole custody of D.I.R.A. Acosta was not aware of this filing until sometime later.

10. On Saturday, January 7, 2012, shortly before noon, Rodela arrived at the family's house in Juarez to take D.I.R.A. to El Paso. Acosta believed the child's trip to El Paso would be for that weekend only. She asked Rodela to return the child by 9:00 p.m. on Sunday, January 8, 2012, and Rodela agreed. The child picked up a few toys and his backpack, and left with the father. On January 8, when the child was not returned, Acosta called Rodela on his cellphone several times beginning at around 9:00 p.m., but her calls went unanswered. On the morning of January 9, she called Rodela again and asked him to return the child. Rodela instructed her to meet at the Ysleta–Zaragoza International Bridge for the purpose of returning D.I.R.A. When she arrived at the bridge on the Mexican side, she called Rodela on his cellphone, and he told her that he could not cross the bridge because he had lost his wallet and his ID. Explaining that it would not be safe for the child to cross over to the Mexican side by himself, Rodela instructed Acosta to cross the bridge to the American side to pick up the child. When she did as instructed, a process server approached her and served her with Rodela's petition for divorce.

Neither Rodela nor D.I.R.A. met Acosta at the bridge; D.I.R.A. was not returned.

11. D.I.R.A. now resides with his father at his paternal grandmother's home in El Paso.

12. On February 2, 2012, Acosta filed an application under the Hague Convention with the Office of Children's Issues at the United States Department of State. On March 5, 2012, she filed a petition under the Convention with this Court.[3]

13. On March 28, 2012, Acosta filed a petition for divorce in the First Family Court of Bravos Judicial District in Juarez. In that petition, she also sought custody of the child.

14. At the time of his removal, D.I.R.A. was enrolled in second grade at Colegio Latino Americano in Juarez and was mid-way through 2011–2012 academic year. Prior to that, he completed first grade and kindergarten, also in Juarez. Beginning January 9, 2012, he attends Lujan Chavez Elementary School in El Paso.

15. At around the age of three, D.I.R.A. began to show signs of developmental and behavioral problems. He had difficulties with sustaining attention, following instructions, dealing with authority figures, and interacting with children of his age. The mother described that on occasion, he would refuse to go outside of home, would be found naked in the home, and would hit himself and cry. Between 2008 and 2010, he received therapy at a Chihuahua state facili-

---

**3.** Acosta filed her petition with Senior District Judge David Briones's Court. The cause was later transferred to the Court of the undersigned judge on May 11, 2012.

ty (Centro de Atencion Multiple), where twice a week he attended classes for children with special needs. With therapy, his condition improved, but in the recent years, following his parents' separation, it has worsened.

16. During the parties' marriage and prior to their separation, Rodela held jobs in El Paso, though he lived in Juarez. During the same period, Acosta did not work. After their separation, she began to work in Juarez and continues to work there as of this date.

## B. Conclusions of Law

### 1. The Hague Convention: Background and Applicable Standards

The Convention was adopted in 1980 in response to the emerging problem of international child abductions perpetrated by parents, guardians, and close family members. *Mozes v. Mozes*, 239 F.3d 1067, 1069–70 (9th Cir.2001). Such abductors unilaterally remove a child from its habitual residence to a country whose courts are likely to be friendlier to them for deciding custodial disputes. *Abbott v. Abbott*, ──── U.S. ────, 130 S.Ct. 1983, 1989, 1996, 176 L.Ed.2d 789 (2010). The drafters of the Convention sought to deter "this unsavory form of forum shopping in the international child-custody disputes." *Kijowska v. Haines*, 463 F.3d 583, 586 (7th Cir.2006).[4] The Convention's stated objective is "to secure the prompt return of children wrongfully removed to or retained in Contracting State"[5] to the State of their habitual residence, Hague Convention, art. 1, and thereby to "restore the pre-abduction status quo." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir.2004) (internal quotation marks and citation omitted). To achieve that objective, the Convention sets out procedures and rules regulating the prompt return of the child. Hague Convention, Preamble. At the core of these procedures is the Convention's return remedy: when a child under the age of sixteen has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions, or affirmative defenses, apply. *Abbott*, 130 S.Ct. at 1989; *Sealed Appellant*, 394 F.3d at 343; Hague Convention, arts. 4, 12.

In 1988, Congress enacted ICARA, the legislation implementing the Convention in this country. The provisions of ICARA "are in addition to and not in lieu of the provisions of the Convention." 42 U.S.C.

---

4. *See also* Department of State, *Hague International Child Abduction Convention; Text and Legal Analysis*, 51 Fed.Reg. 10494, 10504 [hereinafter Convention Analysis] ("A fundamental purpose of the Hague Convention is to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody.").

5. The United States and Mexico are parties to the Convention. The United States became a party when it ratified the Convention in 1988. Hague Convention, art. 37. Mexico, which was not a member of the Hague Conference on Private International Law at the time of the Fourteenth Session that adopted the Con-

vention, became a party through accession. *Id.* art. 38. "The distinction between accession and ratification is that only nations that have ratified the Convention can be considered signatories .... Accession, by contrast, binds a country only with respect to other nations that accept its particular accession." *Gonzalez v. Gutierrez*, 311 F.3d 942, 945 n. 2 (9th Cir.2002), *abrogated on other grounds by Abbott*, 130 S.Ct. 1983. The United States accepted Mexico's accession, and the Convention entered into force between the two countries in 1991. *See* Hague Conf. on Private Int'l Law, *Acceptance of Accession*, http://www.hcch.net/index_en.php?act=conventions.publications&dtid=36&cid=24 (last visited June 20, 2012).

§ 11601(b)(2). Under ICARA, anyone seeking the return of a child allegedly wrongfully removed to or retained in the United States may commence a civil action in any court that has jurisdiction over the action and the place where the child is located. *Id.* § 11603(b). Once such an action is filed, the "court in which [the] action is brought ... shall decide the case in accordance with the Convention." *Id.* § 11603(d). Though the Convention is silent with regard to burdens and standards of proof, ICARA provides that the petitioner seeking the return remedy has the burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." *Id.* § 11603(e)(1)(A). The respondent in any such action has the burden of proving that one of the affirmative defenses listed in Articles 12, 13, or 20 applies. *Id.* § 11603(e)(2). The standard of proof for these defenses is either preponderance of the evidence or clear and convincing evidence. *Id.* § 11603(e)(2)(A)-(B).

■ Deciding a case under the Convention often requires courts to interpret its text. The Convention must be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of [the Convention] in their context and in light of its object and purpose." Vienna Convention on the Law of Treaties, May 23, 1969, art. 31.1, 1155 U.N.T.S. 331, 340 (stating general rule on the interpretation of treaties); *Kreimerman v. Casa Veerkamp, S.A. de C.V.,* 22 F.3d 634, 638 (5th Cir.1994). The interpretation of the Convention requires that courts "look beyond parochial definitions to the broader meaning of the Convention." *Croll v. Croll,* 229 F.3d 133, 145 (2d Cir.2000) (Sotomayor, J.,

dissenting). That interpretive inquiry is further shaped by the views of the United States Department of State, whose Office of Children's Issues serves as the Central Authority for the United States under the Convention, and the negotiation history of the Convention. *Abbott,* 130 S.Ct. at 1990, 1993, 1995; *Sealed Appellant,* 394 F.3d at 343. To that end, courts frequently look to two sources: (1) the Department of State's *Hague International Child Abduction Convention; Text and Legal Analysis,* 51 Fed.Reg. 10494 (Mar. 26, 1986) [hereinafter Convention Analysis], and (2) Elisa Perez–Vera's *Explanatory Report: Hague Convention on Private International Law, in* 3 Acts and Documents of the Fourteenth Session 426 [hereinafter Perez–Vera Report].[6]

■ It bears emphasis that an action under the Convention is not an action to determine the merits of custody rights. Perez–Vera Report ¶ 9, at 428, ¶ 19, at 430. Indeed, ICARA expressly prohibits a court from deciding the merits of the underlying custody dispute. 42 U.S.C. § 11601(b)(4); *England v. England,* 234 F.3d 268, 271 (5th Cir.2000). The Convention is based on the notion that "the best interests of the child are well served when custody decisions are made in the country of habitual residence." *Abbott,* 130 S.Ct. at 1995. Its focus is thus *whether* a child should be returned to the home country for custody proceedings and thus to allow the home courts to determine what is in the child's best interest—not *what* the outcome of those proceedings should be. *Id.; Holder v. Holder,* 392 F.3d 1009, 1013 (9th Cir.2004); *Sealed Appellant,* 394 F.3d at 344. As the Perez–Vera Report explains:

---

6. Elisa Perez–Vera was the official Hague Conference reporter for the Convention, and the Department of State considers her report as "the official history" of the Convention.

*Convention Analysis,* 51 Fed.Reg. 10503. Her report is available at http://www.hcch.net/upload/expl28.pdf.

[The Convention] is not concerned with establishing the person to whom custody of the child will belong at some point in the future .... It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

Explanatory Report ¶ 71, at 447–8. Consequently, ordering a return remedy, when warranted, does not alter the existing allocations of custody rights between the parents. *Abbott,* 130 S.Ct. at 1995; Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

## 2. Petitioner's Case

Acosta requests that D.I.R.A. be returned to Mexico because Rodela's retention of the child in the United States is wrongful under Article 3 of the Convention. That article provides, in pertinent part:

The removal or the retention of a child is to be considered wrongful where—

a) it is in breach of rights of custody attributed to a person, ... either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. Accordingly, to establish a prima facie entitlement to the return remedy, Acosta must show by a preponderance of the evidence that (1)

Mexico was D.I.R.A.'s "habitual residence" immediately before Rodela's retention of D.I.R.A; (2) Acosta has "rights of custody" under Mexican law, and Rodela's retention is in breach of those rights; and (3) Acosta was exercising her custody rights at the time Rodela removed the child. *See id.;* 42 U.S.C. § 11603(e)(1)(A).

### (a) The Child's Habitual Residence

A threshold inquiry in a Hague action is: what country was the child's habitual residence immediately before the alleged wrongful removal or retention. *See Mozes,* 239 F.3d at 1072 (" 'Habitual residence' is the central—often outcome-determinative—concept." (citation omitted)). The Convention, however, does not define the term "habitual residence" or provide guidance on how to determine a child's habitual residence.[7] Our appellate court has not yet had the occasion to address the issue of habitual residence. In *Mozes, supra,* 239 F.3d 1067, the Ninth Circuit has set out an elaborate approach for determining a child's habitual residence. Almost all of the circuit courts that have addressed the issue of habitual residence have adopted in some form the Ninth Circuit's approach. Under this approach, the focus of the inquiry is the parents', not the child's, subjective intention about the child's habitual residence. *Mozes,* 239 F.3d at 1076 (explaining that because children normally lack the material and psychological wherewithal to decide where they will reside, the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence). In applying that approach, a court must also inquire whether the child has lived in the country for "an appreciable period of time

---

7. Perez–Vera Report explains that "habitual residence" is different from "domicile," but provides no further elaboration. Perez–Vera Report ¶ 66, at 445; *see also Norinder v.* *Fuentes,* 657 F.3d 526, 533–34 (7th Cir.2011) ("[H]abitual residence is not necessarily the same as a jurisdiction's conception of 'domicile.' ").

... that is sufficient for acclimatization." *Mozes*, 239 F.3d at 1078 (citation omitted); *see also Holder*, 392 F.3d at 1019 ("[T]he inquiry is, more generally, whether the children's lives have become firmly rooted in their new surroundings."). The Sixth Circuit has parted ways with *Mozes*, explaining that parental intention need not be considered at all at least in cases that do not involve very young children. *Robert v. Tesson*, 507 F.3d 981, 991–92, 993 n. 4 (6th Cir.2007) ("[A] very young ... child may lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose."). Under its formulation, a child's habitual residence is the country "where, at the time of the child's removal, the child has been present long enough to allow acclimatization, and where this presence has a degree of settled purpose from the child's perspective." *Id.* at 993. All circuits agree, however, that the determination of habitual residence "is not formulaic; rather, it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir.2004).

█ D.I.R.A. lived essentially his entire life in Mexico. Although he was born at a hospital in El Paso, his parents were residing in Juarez for more than a year at the time of his birth. Following his birth, they stayed in El Paso for a few days (by the father's account two months) and then returned to Juarez with the newborn. Since then, D.I.R.A. lived in Juarez until his removal in January 2012. There, he grew up surrounded by members of his extended family including his maternal grandmother, aunts, uncles, and eighteen cousins. With them, he developed a meaningful relationship. Acosta's sister (Rocio), who lived across from the child's house, cared for the child whenever Acosta had to run an errand. With his cousins, he celebrated holidays and birthdays. Moreover,

in Juarez, he completed his kindergarten and first grade education, and at the time of his removal, he was enrolled in second grade. *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 293 (3d Cir.2006) ("[A]cademic activities are among 'the most central ... in a child's life' and therefore highly suggestive of acclimatization." (quoting *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir. 1995))). He also had friends with whom he played soccer after school. These facts lead to the conclusion that D.I.R.A. was highly acclimatized and firmly rooted in Juarez. *See Robert*, 507 F.3d at 991 ("A child who lives in Mexico, attends Mexican school, and makes Mexican friends for three years builds an attachment to Mexico that would lead any child to call that country 'home.' ").

Rodela contends that when they translocated from the United States to Mexico in or around March 2003, they had a mutual intention that their stay in Mexico would last for a temporary period of time until they were financially able to buy a home in El Paso; the parties had lived in El Paso for six to eight months following their marriage. Acosta flatly denies that, stating that they moved to Mexico to live there for the long haul. Although the parties agree that economic reasons motivated their move to Mexico (housing was cheaper in Juarez than in El Paso), Acosta testified that they had another reason for the move: Rodela, who grew up in Juarez until he was twelve years old, liked living there. Rodela's contention notwithstanding, subsequent events suggest that the parties adopted Juarez as their home. By late 2010, when the parties separated, they had lived together in Juarez for more than seven years. In 2007, they even bought a house in Juarez (the house appears to have been paid for in full at the time of its purchase), where the child and the parties lived. During this period, the only routine aspect of their daily lives that had a con-

nection to the United States was Rodela's employment in El Paso. (In this part of the world, living on one side of the border and working on the other side is fairly commonplace.) Under these facts, even if the parties had a shared intention to someday return to the United States, they effectively abandoned their prior residence in that country and established a new one in Mexico. *See Mozes,* 239 F.3d at 1075 ("If you've lived continuously in the same place for several years on end, . . . we would be hard-pressed to conclude that you had not abandoned any prior habitual residence.").

Rodela also points out that Acosta obtained a U.S. resident alien card in 2009 and a Texas driver's license in 2010, which, according to him, indicates that they shared an intent to move back to El Paso. According to Acosta, however, she acquired the resident alien card as insurance against a possible eventuality. Around that time, she first observed that the child was suffering from some developmental and behavioral problems. She thought if the treatment in Mexico did not help the child, she might someday have to take him to the United States for further treatment, and that might require her to relocate there. But all this changed when the child's condition improved with therapy over time. She also testified that at the time she obtained the driver's license, Rodela, the only wage-earning member of the family, began to struggle financially, and she wanted to help him by working in El Paso. She acquired the license so that she could drive their vehicle, displaying an American license plate, in El Paso without getting in trouble with the law. As important, Rodela testified that they were working towards moving back to the United States, though they had no set plan. At best, the mother's acquisition of the resident alien card and the driver's license suggests that they were developing a tenuous plan to someday move to the United States and abandon their residence in Mexico. However, the parties never actually followed through with that plan. While the transformation of a child's habitual residence depends upon the settled intention of the parents, it cannot be accomplished "by wishful thinking alone." *Mozes,* 239 F.3d at 1078. It "requires an actual change in geography, as well as the passage of an appreciable amount of time." *Koch v. Koch,* 450 F.3d 703, 715 (7th Cir. 2006).

Accordingly, the Court finds that the parties had no shared, settled intention about the child's habitual residence. Thus, to the extent that D.I.R.A. was highly acclimatized in Mexico, the Court concludes that Mexico was the country of his habitual residence immediately prior to his removal to the United States.

There is moreover an alternative basis for reaching the same conclusion. As mentioned above, at the time the child was born in a hospital in El Paso, the parents were residing in Juarez for more than a year. The parties did not elaborate on the specific reasons why they went to El Paso for the child's birth. They might have thought that the mother and the child would receive better care at an American hospital, or they might have sought to ensure that the child would become a citizen of the United States by virtue of his birth. Be that as it may, given that the parents were still living in Juarez, the child's brief sojourn in the United States immediately following his birth did not make that country his habitual residence. *See Delvoye v. Lee,* 329 F.3d 330, 334 (3rd Cir.2003) (holding that a child born in Belgium was nonetheless habitually resident in the United States because the mother "traveled to Belgium to avoid the cost of the birth of the child and intended to live there only temporarily"). That leaves Mexico as the only viable candidate for the child's habitual residence. "When a child

has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time." *Mozes,* 239 F.3d at 1082.

### (b) Breach of Petitioner's Rights of Custody

The next element of Acosta's prima facie case is whether Rodela's retention of D.I.R.A. in the United States is in breach of her "rights of custody" under the law of "the State in which the child was habitually resident immediately before the removal or retention." Hague Convention, art. 3. The Convention lists three alternative sources by which a dispossessed parent's "rights of custody" may arise: (1) operation of law; (2) a judicial or administrative decision, or (3) an agreement having legal effect under the law of the State of the child's habitual residence. · *Id.* Here, Acosta claims that her "rights of custody" arise by operation of Chihuahua's civil law doctrine or institution of *patria potestad,* meaning parental rights or authority.

### (i) The Application of Mexican Law and Evidentiary Hurdles

The application of Mexican law poses some challenges for a U.S. court which lacks adequate familiarity with such law. Recognizing the peculiar nature of the issue of foreign law, Federal Rule of Civil Procedure 44.1 liberalizes the evidentiary rules for determining such law. *See* Advisory Committee's Notes on 1966 Adoption of Fed.R.Civ.P. 44.1 ("[T]he ordinary rules of evidence are often inapposite to the problem of determining foreign law."). Rule 44.1 provides, in relevant part: "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. Moreover, a "court is not limited by material presented by the parties; it may

engage in its own research and consider any relevant material thus found." Advisory Committee's Notes on 1966 Adoption of Fed.R.Civ.P. 44.1. The Convention similarly provides that a court "may take notice directly of the law of, and of judicial . . . decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Hague Convention, art. 14.

At trial, Acosta submitted into evidence an affidavit by Mexican attorney Mariano Nunez Arreola, which explains some of the relevant Mexican laws. Pet'r's Ex. P–3 (on file with the Court). Pursuant to Rule 44.1, Arreloa's affidavit is acceptable as proof of Mexican laws. *See also* Perez–Vera Report ¶ 101, at 456–57 ("proof of the substantive law of the State of the child's habitual residence may be established by . . . affidavits"). Accordingly, in determining whether Acosta has "rights of custody" under the Convention, the Court relies upon Arreola's affidavit and, when necessary, upon publically· available, relevant materials on Mexican laws.

### (ii) Mexico's Choice of Law Rules

Article 31 of the Convention provides that if, in matters of child custody, the State of the child's habitual residence has two or more systems of law applicable in different territorial units, "any reference to the law of the State of habitual residence shall be construed as referring to the law of the territorial unit in that State where the child habitually resides." Hague Convention, art. 31. The Convention's references to "law" of the State of the child's habitual residence are "purposefully broad." *Shalit v. Coppe,* 182 F.3d 1124, 1128–29 (9th Cir.1999). "[T]he word 'law' has to be understood in its widest sense, as embracing both written and customary rules of law . . . and the in-

terpretations placed upon them by case-law." Perez–Vera Report ¶ 66, at 445. Furthermore, it is not limited to the internal or domestic law of the State of the habitual residence, but also incorporates that State's conflict of law rules. *Id.* ¶ 70, at 447.[8] Accordingly, while a straightforward application of Article 31 of the Convention suggests that the internal law of Chihuahua is the relevant source of law, an inquiry of whether the choice of law rules of Mexico or Chihuahua nonetheless point away from that source of law is instructive.[9]

■ The Federal Civil Code and the Chihuahua Civil Code provide guidance on Mexican choice of law rules as relevant here. Article 12 of the Federal Civil Code states: [10]

> Mexican laws apply to all persons within the Republic; as well as to acts and events that take place within Mexican territory or under its jurisdiction, and to those persons who submit themselves [or their act] thereto, unless [Mexican] law provides for the application of a foreign law, or the application of foreign law is otherwise provided by treaties or conventions to which Mexico is a party.

Stephen Zamora *et al., Mexican Law* 462 (2004) (quoting Fed. Civ.Code, art. 12) (italics omitted; alterations in original).[11] Further, Article 13 of the Federal Civil Code states that "the status and legal capacity of individual persons shall be governed by the laws of the place of their domicile." Fed. Civ.Code, art. 13. Thus, "questions of legal capacity, marital status, [and] custody ... are ... determined in accordance with the law of the person's domicile." Zamora *et al., supra,* at 462. "Domicile" [12] of an individual person, in

---

**8.** *See also id.* ¶ 67, at 446 ("[C]ustody *ex lege* can be based either on the internal law of the State of the child's habitual residence, or on the law designated by the conflict rules of that State."); Convention Analysis, 51 Fed.Reg. 10506 ("Nothing in the Convention limits this 'law' to the internal law of the State of the child's habitual residence. Consequently, it could include the laws of another State if the choice of law rules in the State of habitual residence so indicate.").

**9.** This inquiry is particularly significant in this case because the institution of *patria potestad* is codified, with some variations in language that are relevant here, both at the federal level and at the state level in Mexico. *Compare, e.g.,* Codigo Civil Federal, art. 421 [hereinafter Fed. Civ.Code], *with* Codigo Civil del Estado de Chihuahua, art. 398 [hereinafter Chih. Civ.Code]. The civil codes of Mexican states are modeled after Mexico's Federal Civil Code or the Civil Code of the Federal District of Mexico City—both of these codes, in turn, are derived from 1932 Civil Code for the Federal District, which was applicable to the Federal District of Mexico City and the Federal Territories of Mexico. Stephen Zamora *et al., Mexican Law* 459–60 (2004); Jorge A. Vargas, *Mexican Law for the American Lawyer* 24–25 (2009). While, in the past, there was little, if any, difference between the Federal Civil Code and each of the codes of the thirty-one states, Vargas, *supra,* at 25, in recent years the civil codes of some states, including the Civil Code of the State of Chihuahua, have been revised or updated. Zamora *et al., supra,* at 459.

**10.** The English translations of the relevant provisions of the Federal Civil Code are available on Westlaw under MEXCIVCODE database directory.

**11.** *See also* Pet'r's Exh. P–3 (affidavit of Mexican Attorney Mariano Nunez Arreola) (explaining that Articles 1 and 8 of the Chihuahua Civil Code provide that the Chihuahua code applies to inhabitants or transients of the State of Chihuahua, whatever citizenship they possess, except where the Chihuahua Civil Code specifically provides for the application of the laws of another jurisdiction; stating that nothing in the Chihuahua Civil Code provides "that the parties should subject themselves to other laws if they are inhabitants or transients of the State of Chihuahua.").

**12.** The doctrine of *domicilio* (meaning address) in Mexican law denotes an individual's

turn, is defined as the place where he or she "habitually resides," and "[a] person is presumed to habitually reside at a place if he [or she] remains there for more than six (6) months." Fed. Civ.Code, art. 29; *see also* Chih. Civ.Code, arts. 29, 30. Moreover, a minor is legally domiciled with the parent who has *patria potestad* for that child. Fed. Civ.Code, art. 31(I); *see also* Chih. Civ.Code, art. 32(I). Accordingly, under the Mexican law, Acosta and D.I.R.A. were domiciled in Chihuahua at the time of his removal to the United States. Consequently, Mexico's choice of law rules direct—nothing to the contrary to the earlier finding under Article 31 of the Convention—that the Chihuahua Civil Code governs the determination of whether Acosta has "rights of custody" under the Convention.

### (iii) Whether Petitioner's Rights under Chihuahua's Institution of *Patria Potestad* are "rights of custody" under the Convention

The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). While the Convention provides no further elaboration of the term "rights of custody," and deliberately so,[13] it favors "'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.'" *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir.2000) [hereinafter *Whallon I* ] (quoting Perez–Vera Report ¶ 67, at 446). In *Abbott*, the Supreme Court has provided further guidance on Article 5(a)'s definition of "rights of custody." The Court explained that "[t]he phrase 'place of residence' encompasses the child's country of residence, especially in light of the Convention's explicit purpose to prevent wrongful removal across international borders." *Abbott*, 130 S.Ct. at 1990–91. Accordingly, "the right to determine the child's place of residence" is the right to set or limit not only the child's address within a country, but also the child's country of residence. *Id.* at 1991.

Mexican doctrine of *patria potestad* has its roots in Roman law. It is derived from the Latin term *patria potestas*, which in Roman law, conveyed absolute and despotic rights of a father over his children, including the right to punish his children

---

residence "either in physical sense, or in a legal assuming sense." Jose Antonio Marquez Gonzalez, *Family Law in Mexico* 44 (Roger Blanpain, Michele Colucci, & Walter Pintens eds., 2011). Article 29 of the Federal Civil Code defines domicile in a physical sense: "The domicile of an individual person is the place where he [or she] habitually resides; if none, then where he [or she] has his [or her] principal place of business; if none, then where he [or she] actually lives; and, if none, then where he [or she] is located. A person is presumed to habitually reside at a place if he [or she] remains there for more than six (6) months." Fed. Civ.Code, art. 29; *see also* Chih. Civ.Code, arts. 29, 30. "Legal domicile," on the other hand, is a fiction in that it does not necessarily have to coincide with the physical residence. Gonzalez, *supra*, at 43. "The legal domicile of an individual person is where the law determines his [or

her] place of residence to be for the exercise of his [or her] rights and where he [or she] must comply with his [or her] obligations, even if in fact he [or she] is not there." Fed. Civ.Code, art. 30; *see also* Chih. Civ.Code, art. 31. Further, a specific domicile may be designated in order to comply with specific obligations. Fed. Civ.Code, art. 34; Chih. Civ.Code, art. 34. The Court understands Acosta to assert her present home address in Juarez as her domicile for her *patria potestad* rights and obligations.

**13.** This provision was deliberately left vague due to the drafters' failure to agree on a more precise definition. *See* Perez–Vera Report ¶ 84, at 451–52 ("[S]ince all efforts to define custody rights in regard to [particular situations] failed, one has to rest content with the general description given [in the text].").

even by death. Patricia Begne, *Parental Authority and Child Custody in Mexico,* 39 Fam. L.Q. 527, 527, 529 (2005). In today's Mexico, the institution of *patria potestad* "regulates relations between parents and children until the latter reach the age at which they must fend for themselves." *Id.* at 530. It is largely governed by the civil codes of Mexican states. Designed to protect the interest of children, *patria potestad* constitutes the "most comprehensive" right that a parent can exercise over the person and property of his or her minor children. *Zamora et al., supra,* at 482; *see also* Begné, *supra,* 39 Fam. L.Q. at 531 (" 'Parental authority places a series of correlative rights and obligations on the holder of parental authority, such as custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them, etc.' " (quoting *Amparo Directo* 2078/1974, Victor Manuel Martinez Fernandez (1975))).

■ As with the Federal Civil Code and the civil codes of other Mexican states, Chihuahua's Civil Code embodies the same concept of *patria potestad* comprising a bundle of correlative rights over a minor child. Chih. Civ.Code, tit. 8, ch. 1, art. 388 *et seq.* These rights are equally shared by the mother and the father. *Id.,* art. 391 (providing that parental authority over children shall be exercised by the father and mother); Pet'r's Ex. P-3. *See also* Zamora *et al., supra,* at 482 n. 84 ("The Supreme Court has ruled that . . . 'patria potesta[d], as a general rule, must be exer-

cised by two parents jointly, and only as an exception may it be exercised by one parent.' " (quoting *Amparo Directo* 2627/71; SJF, 7a Epoca, Tercera Sala T. LI (Cuarta Parte), at 59 (1973) (brackets omitted))). In case of separation, parents can "agree on the terms of their exercise of parental authority, particularly in regards to the custody and care of minors," and if the parents are unable to reach an agreement, a judge decides the parents' respective rights. Chih. Civ.Code, art. 393; Pet'r's Ex. P-3. Absent an agreement or a court ruling, the parents' rights and obligations under *patria potestad* continue during their separation. Chih. Civ.Code, art. 393; Pet'r's Ex. P-3. Following their separation in 2010, Acosta and Rodela have not reached a formal agreement as to their parental rights over D.I.R.A.[14] *See* Begné, 39 Fam. L.Q. at 537 ("Usually, a formal agreement between the parents, in cases of . . . separation, helps to set the formal terms of parental authority."). Moreover, there has not been any court ruling regarding the allocation of their rights; nor has there been any court judgment that stripped of either parent's *patria potestad* over D.I.R. A. The Court therefore finds that Acosta and Rodela continue to jointly and severally share all of the rights derived from the institution of *patria potestad.* *Cf.* Hague Convention, arts. 3(a)-(b) (recognizing that "rights of custody" may be held "jointly or alone").

Chihuahua's institution *of patria potestad* gives Acosta both "the right relating to the care of the person of the child" and

---

14. At trial, Acosta conceded that she tacitly agreed to Rodela's visitation rights for weekends only, but Rodela insisted that he had the rights to access the child at any time as he wished. The parties also sparred over other aspects of their parental rights: in particular, who had the exclusive right to live with and provide primary physical care to the child. It is therefore clear that there has not been a meeting of minds between them regarding the allocation of their parental rights over D.I.R.A. *See* Vargas, *supra,* at 138, 140 (explaining that under Mexican law, the elements of an agreement are: (1) consent and (2) an object which can be the subject-matter of the agreement); Jorge A. Vargas, *Mexican Law: A Treatise for Legal Practitioners and International Investors* § 28.4 (1998) (explaining that "consent" means an "agreement of minds" between parties to the agreement).

"the right to determine the child's place of residence" as contemplated under Article 5(a) of the Convention. The Chihuahua Civil Code's provisions governing *patria potestad* expressly give her the rights to live with the child, to provide physical care (*guarda*) to the child, to educate the child, and to discipline the child. Chih. Civ. Code, arts. 390, 394, 399, 400, 402; Pet'r's Ex. P–3. Additionally, parents with *patria potestad* are required to raise their minor children correctly and to conduct themselves in a manner so as to set a good example for their children. *Id.* art. 400; Pet'r's Ex. P–3. These extensive rights are clearly the "right[s] relating to the care of the person of the child." Hague Convention, art. 5(a); *see also Vale v. Avila,* 538 F.3d 581, 586 (7th Cir.2008) ("By virtue of the doctrine of *patria potestas* [of Venezuela], Vale, the father, had rights relating to the care of the person of the child."). Moreover, while the Chihuahua Civil Code gives a parent having *patria potestad* over a child the right to live with that child, it also places a reciprocal obligation on the child not to leave the home of that parent without her permission. Chih. Civ.Code, arts. 394, 398. *See also* Chih. Civ.Code, art. 32(1) (providing that an un-emancipated minor, like D.I.R.A., is deemed as legally domiciled with the person who exercises *patria potestad* over him). It follows therefore that Chihuahua's *patria potestad* gives Acosta, who is free to reside anywhere, the right to determine D.I.R.A.'s "place of residence"—be it an address in Mexico or the country of residence—and consequently the "right to determine the child's place of residence." Hague Convention, art. 5(a); *see also Abbott, supra,* 130 S.Ct. at 1991.

That conclusion is further reinforced by the amendatory language of Article 398 of the Chihuahua Civil Code, which states, in full:

> As long as the child is under parental authority/responsibility (*patria potestad*), he or she shall not leave the house of those who exercise it without their permission or by means of an order issued by an authority legally qualified to do so.
>
> *The abduction or retention of the minor away from his habitual residence, without the permission of those who are exercising patria potestad or [who] have custody, will give rise to the right of procedure of restitution established in the Code of Civil Procedure.*
>
> *The illegal conduct of the abductor or retainer shall result in loss of the rights related to the minor.*

Chih. Civ.Code, art. 398 (emphasis added); Pet'r's Ex. P–3. The italicized language, which does not appear in the Federal Civil Code's parallel provision *on patria potestad,* was added in December 29, 1999, when the Chihuahua legislature amended various articles relating to matters of adoption and *patria potestad.*[15] The legislative history reveals that Article 398 was amended in response to Mexico's participation in two international conventions, one of which is the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry, May 29, 1993, 32 I.L.M. 1136.[16] Because the subject matter

---

15. *Debates: Diario De Los Poder Legislativo Del Estado Libre Y Soberano De Chihuahua* [hereinafter Chih. Legislative Diary], LIX Legislature, Year II, I P.O., at 2536 (Dec. 15, 1999), http://www.congresochihuahua.gob.mx/biblioteca/debates/ (to obtain the document select the following entries: Legislatura—LIX, Ano—II, Perido—I P.O., Fecha–December. 15, 1999).

16. Chih. Legislative Diary, LIX Legislature, Year I, I P.O., at 155, 158 (Oct. 22, 1998), http://www.congresochihuahua.gob.mx/biblioteca/debates/ (to obtain the document select the following entries: Legislatura—LIX, Ano—I, Perido–I P.O., Fecha–October. 22, 1998).

of that convention concerns transborder child adoption, the language "[t]he abduction or retention of the minor away from his habitual residence" in Article 398 encompasses removal or retention of a minor away from Mexico. Thus, Article 398 gives a parent the right to consent before her child can be removed or retained away from Mexico. Properly characterized, Article 398 is therefore a *ne exeat-plus* provision. Under *ne exeat*, a civil law doctrine, a parent's consent is required before her child can be taken to another country. *See* Black Law Dictionary 1131 (9th ed.2009) (explaining *ne exeat* as "[a]n equitable writ restraining a person from ... removing a child ... from[ ] the jurisdiction)." The Supreme Court has held that *ne exeat* rights are "rights of custody," reasoning that *ne exeat* gives a parent the right to determine his child's country of residence, and thereby the right to "determine the child's place of residence" as contemplated under Article 5(a) of the Convention. *Abbott*, 130 S.Ct. at 1990–91 (holding that the father, who had only visitations rights under a Chilean court decree, had "rights of custody" by virtue of Chilean statutory *ne exeat* provision which provided that once a court decrees that one of the parents has visitation rights, that parent's authorization is required before the child can be taken out of the country). It follows therefore that Acosta's Article 398 right to consent gives her the right to determine D.I.R.A.'s country of residence, and thereby the right to "determine the child's place of residence."

Accordingly, the Court concludes that Acosta's rights pursuant to Chihuahua's institution of *patria potestad* are "rights of custody" under the Convention. Further, the Court finds that Rodela's retention of D.I.R.A. in the United States is in breach of Acosta's custody rights. Specifically, because Acosta did not consent to Rodela's retention of the child in the United States, his retention is in breach of Acosta's right to consent before D.I.R.A. could be retained away from Mexico, as provided under Article 398 of the Chihuahua Civil Code. His retention also breaches Acosta's other rights under Chihuahua's *patria potestad*, such as her rights to live with the child and care for the child, as his retention precludes her from exercising those rights.

### (c) Petitioner's Exercise of Her Rights of Custody

■ The third and the final element of Acosta's prima facie case is: whether she was actually exercising her custody rights at the time of D.I.R.A.'s removal and retention. The Convention does not define the term "exercise." Courts in this country have construed the term broadly in order to avoid crossing the line into a consideration of the underlying custody dispute. *Sealed Appellant*, 394 F.3d at 344 (listing cases). Under the courts' liberal construction, a non-removing parent with rights of custody cannot fail to exercise those rights short of acts that constitute abandonment of the child. *Id.* at 345. The non-removing parent need only adduce "some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." Convention Analysis, 51 Fed. Reg. 10507 (citing Perez–Vera Report ¶ 73, at 448).

■ There is no evidence here to suggest, even remotely, that Acosta abandoned D.I.R.A. Quite the contrary, the record evidence unequivocally demonstrates that prior to the child's removal and retention, Acosta, *inter alia*, lived with him, took physical care of him, took him to school, helped him with his homework, and took him to therapists to treat his behavioral and developmental maladies. No

more is necessary to establish that Acosta was actually exercising her rights of custody at the time of D.I.R.A.'s removal and retention.

Accordingly, the Court finds that Rodela's retention of D.I.R.A. in the United States is wrongful under the Convention. Acosta, therefore, has established a prima facie entitlement to the return remedy.

### 3. Respondent's Case

■ Even when a court finds wrongful removal or retention, "a return order is not automatic." *Abbott*, 130 S.Ct. at 1997. After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove one of the affirmative defenses provided under the Convention to prevent the child's return to the country of habitual residence. *See* Hague Convention, arts. 12, 13(a), 13(b), 20. If the respondent prevails on any of these defenses or exceptions, a court may decline to order the return of the child. *Sealed Appellant*, 394 F.3d at 343. These exceptions are "narrow" and should be construed narrowly by the courts to effectuate the purposes of the Convention. *England*, 234 F.3d at 270–71; *Karkkainen*, 445 F.3d at 288. Otherwise, the Convention would become a dead letter. *See* Perez–Vera Report ¶ 34, at 434–35 (noting that "a systematic invocation of the [Convention's] exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration."). Here, Rodela relies on two of these defenses: under subsections (a) and (b) of Article 13.[17]

#### (a) Respondent's Art. 13(a) Defense: Claim that Petitioner Consented to the Retention of the Child in the United States

■ A child may not be returned to his country of habitual residence if the removing party can show, by a preponderance of the evidence, that the non-removing party "had consented to ... the removal or retention." Hague Convention, art. 13(a); 42 U.S.C. § 11603(e)(2)(B). "The consent defense involves the petitioner's conduct prior to the contested removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir.2005) (citations omitted). The consent inquiry turns on the subjective intent of the parent who is claimed to have consented. *Id.* The Third Circuit has explained:

> In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.

*Id.* Further, " 'each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights.' " *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir.2007) (holding in that case that "a single e-mail message indicating a willingness to allow the children to live with their mother in Ohio should not be the basis for a finding that [the non-removing parent] consented to their removal, especially given the manner

---

**17.** In his answer to Acosta's petition, Rodela asserted other defenses, but at trial he did not present any argument or proffer any evidence

in support of those defenses. Accordingly, those defenses are deemed abandoned, and the Court will not address them here.

in which the [removing parent] removed the children.") (brackets omitted) (quoting *Friedrich v. Friedrich,* 78 F.3d at 1070 (6th Cir.1996) [hereinafter *Friedrich II* ] ).

Rodela testified that during the last week of December 2011, he met with Acosta in Juarez to discuss the child's schooling. At the meeting, he related to Acosta that he wanted the child to attend school in El Paso. He also testified that previously the parties had exchanged emails (not proffered into evidence), wherein he explained that it would be too expensive to have the child reside in Mexico (thus be considered a resident of Mexico for purposes of tuition and fees) and attend school in El Paso; he suggested that the child should live with Rodela's mother in El Paso. The meeting and the emails show, according to Rodela, that Acosta agreed to let the child live and attend school in El Paso beginning January 2012. He further testified that he made arrangements for the child to live with Rodela's mother at her home in El Paso, and that a few days before D.I.R.A.'s removal, Rodela moved into her home (previously he stayed with his uncle in El Paso). Thus, when he arrived at Acosta's house on January 7, 2012, Rodela maintained, he did not agree to return the child by the next day; he was there to pick up the child and relocate him to El Paso permanently.

During her testimony, Acosta denied that she ever agreed to let the child live and attend school in El Paso. According to her testimony, when Rodela came to her house on January 7, the child met the father at the door, and the father told the child that he had some toys for him in El Paso and the child was to go with him there. Acosta believed that it was going to be another weekend visit to El Paso (the parties agree that since their separa-

tion, the child generally stayed with the father in El Paso over weekends). But she was apprehensive that Rodela would not return the child on time. She explained that during the weekend of December 17, 2011, she let the child visit his father for that weekend, but the father had not returned him until a week later on Christmas Eve.[18] Consequently, on January 7, Acosta reminded Rodela that in the past he had not returned the child on time and instructed him to bring the child back by 9 p.m. on Sunday, January 8. According to her, Rodela agreed by nodding his head.

So, the issue of whether Acosta agreed that the child would live and attend school in El Paso beginning January 2012, and therefore, whether Acosta consented to Rodela's retention of the child in El Paso, boils down to a "he said, she said" dispute. Rodela, who had the burden of persuasion and production on the defense of consent, did not adduce any evidence that supported his contentions. Accordingly, the resolution of this issue necessarily turns on the question of whose testimony is more credible.

■■■■ To that end, the timing of and the surreptitious manner in which Rodela served process on Acosta undercuts his credibility. *See Simcox,* 511 F.3d at 603 ("[T]he deliberately secretive nature of the actions of the removing parent is extremely strong evidence that the other parent would not have consented to the removal" (brackets omitted) (quoting *Friedrich II,* 78 F.3d at 1069)). On the morning of January 9, when the mother called him for the child's return, he instructed her to meet him at the Ysleta–Zaragoza International Bridge. According to his own testimony, they were going to discuss the child's schooling at the bridge, but he also

---

18. Acosta's representation of the facts surrounding that visit was largely corroborated by Rodela's own testimony, save for his insistence that it was his turn to spend Christmas with the child that year.

gave Acosta specific instructions to cross the bridge so that she could be on the American side of the border (he testified that she was *supposed* to cross over the bridge). But what transpired next at the bridge was not a meeting for such a discussion, but a service of process on Acosta; neither Acosta nor D.I.R.A. was there to meet her.

Moreover, regarding his motive for seeking the sole custody of the child in the state court proceeding, he testified before that court that he *had* to bring the child over to keep Acosta from beating the child again. Before this Court, he testified that in the past she had threatened to deny him access to the child and therefore he wanted to have a set schedule in the United States, where he could see him. These statements are indicative of his unilateral actions: he sought to secure the child's presence with him in the United States and then serve process on the mother so that he could litigate his custody rights under the law of the United States-presumably a sympathetic forum for him. It is entirely plausible that Rodela *discussed* with Acosta his desire to have the child live and attend school in El Paso, but a discussion with the mother is not tantamount to an agreement by the mother. Furthermore, it is not readily consumable that a mother who pursued every possible legal avenue, short of self-help, for the return of her child-including contacting (through her sister Rocio) the Mexican consulate in El Paso on the same day she was served at the bridge, filing a Hague application with the U.S. Department of State, and petitioning this Court under the Convention-agreed to the child's translocation to El Paso.

Accordingly, the Court finds that at the time D.I.R.A. was removed to the United States, Acosta agreed only to let the child stay with Rodela until January 8, 2012, and that she did not consent to Rodela's retention of the child in the United States beyond that date. Rodela therefore cannot prevail on the defense under Article 13(a) of the Convention.

### *(b) Respondent's Article 13(b) Defense: Claim that Return of the Child Would Cause Grave Risk of Physical or Psychological Harm to the Child*

A removing party may also prevent the child's return if she can show, by clear and convincing evidence, that: "there is a grave risk that his or her return would expose the child to physical or psychological harm." Hague Convention, art. 13(b); 42 U.S.C. § 11603(e)(2)(A). In *Walsh v. Walsh*, the First Circuit set out the following standard for Article 13(b) defense:

> The text of the article requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. Not any harm will do nor may the level of risk of harm be low. The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. For example, the harm must be something greater than would normally be expected on taking a child away from one parent and passing him to another; otherwise, the goals of the Convention could be easily circumvented.

*Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir.2000) (citations omitted), *cited with approval in Abbott*, 130 S.Ct. at 1997. Moreover, because courts are not to determine the merits of the underlying custody dispute, "'it is not relevant ... who is the better parent in the long run.'" *Id.* (brackets omitted) (quoting *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 377 (8th Cir.1995)); *see also* Convention Analysis, 51 Fed.Reg. 10510 (explaining that Article 13(b) was not intended to be used by

respondents as a vehicle to litigate the child's best interests). "Only evidence directly establishing the existence of a grave risk ... is material to the Court's determination." Convention Analysis, 51 Fed. Reg. 10510.

■■■ At trial, Rodela alleged that Acosta subjects the child to physical and psychological abuse. He avers that, on several occasions, Acosta struck the child with a stick and a belt. At times, he further claims, Acosta struck her hand to the child's head, face, and leg. He also asserts that Acosta yells at the child. These conducts, according to Rodela, resulted in family violence under Texas law. At trial, Rodela introduced a demonstrative evidence of the stick: it is 1–1/2 feet long, 1–1/2 inches wide, and 1/4 inches thick, and weighs about two ounces. Resp.'s Ex. G. According to the testimony of Rocio, Petitioner's sister, Rodela used to bring those sticks to the parties' home because the child liked to play with them and use them as swords. Rodela testified that although he never saw any marks on D.I.R.A.'s body, the child suffered psychological harm. He related that the child "freezes"—presumably because of the psychological harm done to him by his mother.

Acosta testified that she had one such stick. In her family, she explained, such sticks are known as "magic stick" or the "wisdom stick," and they are used to discipline children: swat a child with it once and she/he will be scared of it. In case of D.I.R.A, she would say in his presence "where is that stick?" or "I am going to look for the stick"; that, she said, would be enough to secure his obedience. She further testified that during the child's entire life, she struck him with the stick only on three occasions; and on each occasion, she struck him only once and only on his buttocks. She also testified that on one occasion, when the child was hitting the wall with a belt, she took the belt away from

him and struck him with the belt. Other than these four occasions, she stated, she never hit the child. She vehemently denied Rodela's characterization that she abuses or hits the child as a matter of course.

Acosta also introduced a deposition testimony by one Veronica S. Torres, who is a special education teacher at Centro de Atencion Multiple, a Chihuahua state facility in Juarez. It was there that the child received therapy for his developmental and behavioral problems between 2008 and 2010. Torres's testimony reveals that after D.I.R.A.'s removal, Rodela took the child to Torres, asking her to evaluate whether the child had been a victim of mistreatment. Pet'r's Ex. P–3, at 18. She testified that based on her evaluation, she observed no sign of any physical or psychological mistreatment. Id. at 18–19. She further testified that over the course of her dealing with D.I.R.A. since 2008, she never observed any sign that the child might have been subjected to any aggression, mistreatment, or abuse. Id. at 15.

Significantly, at trial Rodela presented no expert or opinion (other than his own) testimony in support of his allegations of physical and psychological harm, even though prior to trial, he filed a witness list, listing as witnesses, among others, a child protective representative and a licensed professional counselor, who allegedly treated the child for physical and emotional harm. The Court finds that the evidence presented fails to meet the demanding burden for establishing an exception under Article 13(b) of the Convention. Accordingly, Rodela's defense on this ground must also fail.

In sum, Acosta has carried her burden to show that Rodela's retention of D.I.R.A. is wrongful under the Convention. Rodela, on the other hand, has failed to carry his burden to establish one of the excep-

tions to the return remedy. Accordingly, the Court must order that D.I.R.A. be returned "forthwith" to Mexico, the child's habitual residence, so that a Mexican court may consider the question of custody. Hague Convention, art. 12.

#### 4. State Court Proceedings and This Court's Return Order

On February 1, 2012, in the matter of Rodela's petition for divorce and custody, *In re Marriage of Rodela & Saldivar & ex rel. D.I.R.A.*, No. 2011DCM00316 (388th Dist. Ct., El Paso County), the Honorable Judge Patricia A. Macias of the 388th Judicial District Court of Texas entered an order, which reads in relevant part:

> IT IS ORDERED that at this time the primary residence of the child shall be El Paso County Texas, and the parties shall not remove the child from El Paso County Texas for the purpose of changing the primary residence of the child until modified by further order of this Court.

V. Compl./Pet. for Return of Child to Pet'r, Ex. J, ECF No. 11–1 ("Order on Motion for Temporary Emergency Jurisdiction and Temporary Order Access and Possession of the Child"). That order is repeated in a later order issued by Judge Macias on April 18, 2012. Resp't's List of Proposed Witnesses and Exhibits, Ex. C., ECF No. 18 ("Additional Orders on Motion for Temporary Emergency Jurisdiction and Temporary Order Access and Possession of the Child," signed on April

18, 2012, and filed on May 4, 2012). Counsel for Acosta represented to this Court that at a hearing held on April 30, 2012, Judge Macias granted in open court Acosta's Motion to Stay the state court action. However, Rodela's counsel Marlene Gonzalez, who also represents him in the state court proceeding and was present at the April 30 hearing, stated that she had no recollection of such order.

 It is therefore unclear whether Judge Macias stayed the state court proceeding,[19] and if so, what effect, if any, the stay order has on her orders issued on February 1 and April 18. If those orders are still in effect, they are in conflict with this Court's order, *infra*, directing that D.I.R.A. be returned to Mexico. The Hague Convention, "a treaty implemented by a federal statute[,] overrides a state law or judgment." *Vale v. Avila*, 538 F.3d 581, 586 (7th Cir.2008). Consequently, an order issued by this Court pursuant to the Convention and ICARA preempts a conflicting state court order or judgment issued pursuant to state law. Moreover, the *Rooker–Feldman* doctrine [20] would not bar this Court from vacating a state court's order enjoining removal of the child from its jurisdiction. *Mozes v. Mozes*, 239 F.3d 1067, 1085 n. 55 (9th Cir.2001).

This Court, having full confidence that Judge Macias will take appropriate action as to the above-mentioned orders issued by her in Rodela's divorce/custody proceeding, will take no action regarding

---

19. Hague Conv., art. 16 ("After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial ... authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention."); *Yang v. Tsui*, 416 F.3d 199, 203 (3rd Cir.2005) ("[I]t is the custody determination, not the Hague Convention Petition, that should be held in abeyance if proceedings are going forward in both state and federal courts.").

20. Under this doctrine, only the U.S. Supreme Court has the authority to review a state court judgment. *See generally Rooker v. Fid. Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 486–87, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

those orders at this time. If an action by this Court is required in the future, the Court will exercise its jurisdiction in an appropriate manner at that time.

### 5. Attorney Fees and Costs

Acosta requests this Court to award attorneys' fees and costs including transportation expenses that she incurred as a result of Rodela's wrongful retention. V. Compl./Pet. for Return of Child to Pet'r 9. Under the Convention's "optional provision," the court "may, where appropriate" direct the removing parent to cover necessary expenses, including cost of legal representation, of the non-removing party, if it orders the return of the child. *Sealed Appellant*, 394 F.3d at 346; Hague Convention, art. 26. ICARA, however, makes it mandatory for the Court to award such fees and expenses. *Id.*; *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir.2004) [hereinafter *Whallon II* ]. ICARA provides, in pertinent part: "Any court ordering the return of a child ... shall order the respondent to pay necessary expenses incurred by ... the petitioner, including court costs, legal fees, ... and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). It is the respondent's burden to show that an award of fees/expenses would be "clearly inappropriate." *Whallon II*, 356 F.3d at 140.

Acosta has not yet submitted an itemized list of fees and expenses, and an affidavit in support thereof. Moreover, in his answer, Rodela appears to counter that an award of attorneys' fees in this case would not be appropriate because Acosta is represented by Texas Rio Grande Legal Aid, Inc., whose legal aid programs are funded by grants from various federal, state, or local sources. Resp't's Original Answer 4, ECF No. 8. The Court is of the opinion that Rodela's argument needs further briefing supported by relevant authorities. The Court therefore withholds any ruling on Acosta's requests for fees and expenses at this time; further filings by the parties are ordered below.

### III. CONCLUSION

For the foregoing reasons, the Court enters the following orders:

1. The Court **GRANTS** Petitioner Sonia Eladia Acosta Saldivar's "Verified Complaint/Petition for Return of Child to Petitioner" [ECF No. 1].

2. Petitioner Sonia Eladia Acosta Saldivar is hereby **AWARDED** physical custody of D.I.R.A. for the purpose of returning D.I.R.A. to his country of habitual residence, Mexico. Respondent Erick Rodela **SHALL SURRENDER** D.I.R.A. to the custody and possession of Petitioner **within SEVEN (7) days** of the date of this Order.

3. This Order is a determination only of the issues presented to the Court under the Convention and ICARA, 42 U.S.C. §§ 11601–11611. This Order is not a determination or adjudication of custody, visitation, allocation of parental responsibilities, determination of parenting time, or allocation of decision making responsibility under any other law. Once D.I.R.A. is returned to Mexico, the parties' rights are governed under the laws of Mexico and the State of Chihuahua.

4. Petitioner **SHALL FILE** a notice with the Clerk of Court immediately upon D.I.R.A.'s return to Petitioner, indicating that Respondent has fully complied with the return.

5. Absent leave of this Court, Respondent **SHALL NOT** remove, **NOR SHALL** he **ALLOW** anyone else to remove, D.I.R.A. from the Western

District of Texas, El Paso Division, **pending** D.I.R.A.'s return to Petitioner.

6. Petitioner **SHALL FILE,** within **fourteen (14) days,** an itemization of all fees, costs, and expenses she seeks to recover, along with a brief explaining why, in light of Respondent's argument mentioned in Part II.B.5, *supra,* she is entitled to attorneys' fees. Respondent **SHALL HAVE seven (7) days** from the date of service of Petitioner's brief to show that such an award would be "clearly inappropriate." Petitioner **SHALL THEN HAVE three (3) days** to respond.

7. The Court **RETAINS JURISDICTION** over this case to permit any modification or enforcement of the Order.

8. The Clerk of the Court **SHALL CLOSE** this case.

A separate judgment in accordance with this Memorandum Opinion and Order will issue this date.

**SO ORDERED.**