Amelia Aguilar BERNAL, Petitioner,

v.

Gerardo Bahena GONZALEZ,
Respondent.

No. MO–12–CV–00091–DC.

United States District Court,
W.D. Texas,
Midland/Odessa Division.

Nov. 29, 2012.

Pamela M. Brown, Texas RioGrande Legal Aid, Inc., Weslaco, TX, for Petitioner.

James D. Jepson, McCamey, TX, for Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID COUNTS, United States Magistrate Judge.

BEFORE THE COURT is Petitioner Amelia Aguilar Bernal's Verified Petition

for Return of Children. (Doc. # 1). This case was referred to the Magistrate Judge for the Midland/Odessa Division on August 27, 2012, by Order of Referral from the United States District Judge pursuant to 28 U.S.C. § 636 and Appendix C of the Local Rules. (Doc. # 5). On October 2, 2012, Petitioner Amelia Aguilar Bernal and Respondent Gerardo Bahena Gonzalez appeared before the Court at a hearing to address Petitioner's Verified Motion for Preliminary Injunction. (Doc. # 3). At the hearing both parties consented to the undersigned U.S. Magistrate Judge for final disposition of this case on the merits. (Docs. # 17 & # 18). Subsequently, the United States District Judge issued an Order on October 9, 2012, reassigning this case to the undersigned. (Doc. # 30).

On October 10, 2012, the Court held a bench trial and heard testimony from Petitioner Bernal, Respondent Gonzalez, and their 16–year–old child, A.B. (male). Following the bench trial, the Court ordered supplemental briefing. (Doc. # 34). Thereafter, the Court ordered further briefing based on an Order for Clarification. (Doc. # 42). After due consideration and upon review of the complaint, testimony, exhibits, briefing, and all arguments made, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## I. FINDINGS OF FACT

1. Petitioner Bernal and Respondent Gonzalez are citizens of the Republic of Mexico.

2. Petitioner and Respondent were married in Elk Point, South Dakota, on January 31, 2003.

3. Petitioner and Respondent are the parents of four children: A.B. (male), C.G.B., C.D.B., and A.B. (female). The children were all born in the United States of America and are, thus, United States citizens.

4. A.B. (male) was born in 1996 in California. He is currently sixteen years old and not eligible for return to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction. He is not subject to this suit.

5. C.G.B. and C.D.B. are ten year old twins, born in Iowa in 2002. A.B. (female) is five years old, also born in Iowa, in 2007. C.G.B, C.D.B., and A.B. (female) are eligible for return to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction.

6. In 2008, Petitioner and Respondent moved to Guasaves, Sinaloa, Mexico, from the United States, with their four children. There, Respondent purchased land and built a house. A.B. (male), C.G.B., and C.D.B. attended school in Guasaves, Sinaloa, Mexico. A.B. (female) was at home with Petitioner or family members. Petitioner took care of the children while Respondent worked in the United States.

7. Petitioner and Respondent had marital problems and separated in 2010.

8. On December 16, 2010, Petitioner and Respondent entered into an agreement regarding the care of their four children at the *Desarrollo Integral de La Familia* (DIF)[2] in Guasaves, Sinaloa, Mexico. The

---

1. To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

2. The Integral Family Development Agency, or DIF, is a national Mexican social welfare organization dedicated to family issues such as child welfare.

agreement was entered into in the presence of a *Ministerio Publico*.[3] The parties agreed in writing that: (1) Respondent would pay $1500.00 Mexican pesos per week for support of A.B. (male), C.G.B., C.D.B., and A.B. (female); and (2) Respondent would have weekend visitation rights. The agreement restricted Respondent's visitation to locations within Sinaloa, Mexico. Respondent and Petitioner signed the agreement and each placed inked thumb prints on the document.

9. The agreement entered into at DIF is valid under the laws of the Republic of Mexico and the State of Sinaloa, Mexico.

10. After signing the agreement, Respondent returned to the United States to work.

11. Respondent complied with the agreement and paid $1500.00 Mexican pesos per week for support of his four children.

12. At some point in March of 2011, Respondent returned to Guasaves, Sinaloa, Mexico, with the intent to retrieve his four children and move them to the United States.

13. On or about March 25, 2011, Respondent picked up A.B. (male), C.G.B., C.D.B., and A.B. (female) from Petitioner for a weekend of visitation as per their written agreement.

14. On or about March 25, 2011, Respondent took A.B. (male), C.G.B., C.D.B., and A.B. (female) to the United States. Petitioner never consented to the initial removal of her four children to the United States and never subsequently acquiesced to the removal of the children.

15. On or about March 26, 2011, Petitioner first learned, from her sister, that Respondent was taking A.B. (male), C.G.B., C.D.B., and A.B. (female) to the United States for relocation. Respondent telephoned Petitioner's sister and informed her that he would not be returning the children to Petitioner, but that he was taking them to the United States instead.

16. Petitioner diligently pursued the location and return of her children. On or about March 28, 2011, Petitioner reported Respondent's taking of the children to the *Ministerio Publico* in Guasaves, Sinaloa, Mexico. The *Ministerio Publico* referred Petitioner to the United States Consulate located in Hermosillo, Sonora, Mexico.

17. Approximately two weeks after making a report to the *Ministerio Publico*, Respondent traveled to the United States Consulate in Hermosillo, Sonora, Mexico. There, Petitioner learned of the Hague Convention on the Civil Aspects of International Child Abduction. The United States Consulate referred Petitioner to the *Secretario de Relaciones Exteriores* ("Foreign Relations Secretary"). Petitioner traveled to Culican, Sinaloa, Mexico, to meet with the Mexican Foreign Relations Secretary where they assisted Petitioner in her Application for Return of Children. On July 12, 2011, Petitioner signed an Application for Return of Children.

18. The Application for Return of Children was received by the Mexican Foreign Relations Secretary's Office on August 2, 2011. On or

---

**3.** Under the Mexican legal system a *Ministerio Publico* is equivalent to a district attorney.

about August 16, 2011, the Mexican Foreign Relations Secretary's Office forwarded Petitioner's Application for Return of Children to the U.S. Department of State.

19. Upon leaving Mexico, Petitioner first took A.B. (male), C.G.B., C.D.B., and A.B. (female) for a brief stay in San Diego, California. From California, they moved to Nebraska.

20. From information provided to her by her aunt, Petitioner learned A.B. (male), C.G.B., C.D.B., and A.B. (female) were in Nebraska soon after their arrival there.

21. Petitioner spoke by telephone with Respondent and Petitioner's niece, who resided in Nebraska, after A.B. (male), C.G.B., C.D.B., and A.B. (female) were moved to Nebraska. Petitioner might or might not have been permitted to speak with her children by telephone while they were living in Nebraska.[4]

22. Petitioner requested that Respondent return the children to Mexico and he refused.

23. Respondent moved A.B. (male), C.G.B., C.D.B., and A.B. (female) from Nebraska to Crane, Texas.

24. Petitioner first learned that Respondent moved A.B. (male), C.G.B., C.D.B., and A.B. (female) from Nebraska to Crane, Texas, via a telephone conversation with her niece after relocation occurred.

25. Petitioner might or might not have spoken with her children for the first time since removal from Guasaves, Mexico, by telephone, after they were relocated to Crane, Texas.[5]

26. Respondent filed for divorce in a Texas court on May 2, 2012. A default judgment was entered by the Texas court on July 26, 2012. Respondent was awarded sole managing custody.

27. Petitioner filed suit in the Western District of Texas, Midland/Odessa Division, for Return of Children on August 27, 2012.

28. C.G.B., C.D.B., and A.B. (female) are located in Crane, Texas, in Crane County, a city within the jurisdiction of the Western District of Texas, Midland/Odessa Division. *See* 28 U.S.C. § 124(d)(7).

29. There were no objections to Petitioner's motion for judicial notice. Thus, the Court took judicial notice of the following as permitted by Article 14 of the Convention: (1) the Civil Code of the State of Sinaloa, Mexico; (2) the Code of Civil Procedure of the State of Sinaloa, Mexico; (3) the Federal Civil Code of Mexico; (4) the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"); (5) the International Child Abduction Remedies Act ("ICARA"); (6) the Hague Conven-

---

**4.** It is disputed whether Petitioner was allowed to speak with her children while they were living in Nebraska. Petitioner asserts she was denied telephone access to her children, while Respondent contends telephone access to the children was freely given to Petitioner.

**5.** Again, it is disputed whether Petitioner was allowed to speak with her children while they were living in Nebraska. Petitioner asserts she was denied telephone access to her children and that her first contact occurred five or six months after their removal from Mexico once they were relocated to Crane, Texas. Respondent testified that telephone access was only denied due to connection problems while traveling from Mexico to San Diego and that access was restored in Nebraska.

tion on the Civil Aspects of International Child Abduction, Text and Legal Analysis; (7) the status of the United States of America and Mexico as signatories to the Hague Convention on the Civil Aspects of International Child Abduction.

30. In accordance with Article 17 of the Convention, the decision of the Texas court to award Respondent sole managing custody over the children is not grounds for refusing to return the children under the Convention.

31. The Republic of Mexico was the country of habitual residence for A.B. (male), C.G.B., C.D.B., and A.B. (female) prior to their removal on or about March 25, 2011.

32. In accordance with Article 3 of the Convention and the International Child Custody Abduction Remedies Act, Petitioner proved by a preponderance of the evidence that C.G.B., C.D.B., and A.B. (female) were wrongfully removed from their country of habitual residence. Petitioner had rights of custody under the laws of the State in which the children were habitual residents immediately before removal and was exercising those rights before removal. Respondent's removal of C.G.B., C.D.B., and A.B. (female) breached Petitioner's rights of custody.

33. In accordance with Article 13 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish by clear and convincing evidence that there is a grave risk that return of C.G.B., C.D.B., and A.B. (female) would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation. Respondent argues that the following provides evidence that return would expose the children to physical or psychological harm or place the children in an intolerable situation: (1) the ongoing cartel violence in Guasaves, Sinaloa, Mexico; [6] (2) an occurrence in which A.B. (male) was a passenger in a vehicle stopped at gunpoint by alleged cartel members; [7] (3) Petitioner's possible overconsumption of alcohol; (4) Petitioner's possible late night visits by men seeking money; (5) Petitioner's alleged inability to provide a clean house for the children; (6) Petitioner's lack of employment; (7) an occurrence in which A.B. (female) was stung by a scorpion and Petitioner could not be located; and (8) Petitioner's failure to buy the children properly fitting clothes and shoes with money provided by Respondent.

34. In accordance with Article 12 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish by a preponderance of the evidence that C.G.B., C.D.B., and A.B. (female) are now settled in their new environment.

6. Respondent testified to observing what appeared to be dead bodies in the river near their home in Guasaves, Sinaloa, Mexico.

7. A.B. (male) testified that he was in a vehicle with his uncle, grandmother, and cousin. The vehicle was stopped by armed men and a gun was pointed at his uncle. A.B. (male) further testified that the armed men were not police and were looking for people in a similar vehicle. The armed men allowed them to leave.

## II. ANALYSIS

### A. The Hague Convention and the International Child Abduction Remedies Act

Petitioner's case arises pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "the Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc, No. 99–11. The Convention's purpose is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1. The United States is a Contracting State and Congress implemented its provisions through the International Child Abduction Remedies Act (hereinafter "ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 *et seq.* ICARA establishes procedures for applying the Convention in the courts of the United States, specifically assigning burdens of proof for proving a case for return of a child and for establishing affirmative defenses to return. *See* 42 U.S.C. § 11603. In addition, Congress made clear the provisions in ICARA "are in addition to and not in lieu of" the Convention. *Id.* at § 11601(b)(2).

■ ICARA unequivocally limits the scope of U.S. courts to decide "rights under the Convention and not the merits of any underlying child custody claims." *Id.* at § 11601(b)(4). The purpose of ICARA is to give courts the tools to implement the Convention's primary goals of "restor[ing] the pre-abduction status quo and … deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir.1996)). "[A]ny debate on the merits of the question, *i.e.* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal…." Elisa Pérez–Vera, Explanatory Report ¶ 19, *in* 4 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 430 (1982) (hereinafter the "Elisa Pérez–Vera Explanatory Report").[8]

Procedurally, a petitioner seeking return of a child may file a petition in either federal or state court for a decision made "in accordance with the Convention." 42 U.S.C. § 11603(a), (b), (d). A court's jurisdiction is proper when the alleged wrongfully removed children are physically located within the court's jurisdiction. *Id.* at § 11603(b). "The Convention ceases to apply when the child attains the age of 16 years." Convention, art. 4.

### B. Petitioner Bernal's case

■ "The Convention's central operating feature is the return remedy." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010). A petitioner seeking the return of a child under ICARA has the burden of proof to establish by a pre-

---

8. The Elisa Pérez–Vera Report "is recognized by the Conference as the official history and commentary on the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10494; 10503 (1986). In *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1994, 176 L.Ed.2d 789 (2010), doubt was cast as to whether the Elisa Pérez–Vera Report should be given great weight as the official commentary of the Convention or whether it is simply a scholarly secondary source. In any event, the Fifth Circuit has consistently used the Elisa Pérez–Vera Report as an authoritative source on the background and meaning of the provisions in the Convention. *See e.g., Larbie v. Larbie,* 690 F.3d 295, 306–07 n. 12 (5th Cir.2012); *Sealed Appellant v. Sealed Appellee,* 394 F.3d 338, 343 (5th Cir.2004). This Court shall do the same.

ponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). A parent wrongfully removes a child under the Convention when removal takes the child outside of the child's country of habitual residence and the removal breaches the custody rights of the non-removing parent under the laws of that country. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir.2004); Convention, art. 3(a). Furthermore, the non-removing parent must have been exercising those custody rights at the time of removal. *Sealed Appellant*, 394 F.3d at 343; Convention, art. 3(b).

■ Thus, proving a case of wrongful removal under the Convention consists of three elements that must be established by a preponderance of the evidence. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir.2012). "First, the petitioner must show that the respondent removed or retained the child somewhere other than the child's habitual residence." *Larbie*, 690 F.3d at 307. Second, if petitioner is successful in proving the threshold element, then the "question becomes whether the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws." *Id.* (citations omitted). And third, if petitioner has rights of custody under the habitual-residence nation's laws, then petitioner need only make a final showing that "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.* (quoting Convention art. 3(b)).

### i. Habitual Residence

■ The threshold question before the Court is whether Mexico was the habitual residence of C.G.B., C.D.B. and A.B. (female). *See Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir.2001). The Convention does not define the term "habitual residence." *Mozes*, 239 F.3d at 1071; *see* Convention, arts. 1–45 (providing no definition for habitual residence). Similarly, ICARA does not provide guidance. *See* 42 U.S.C. § 11602. Thus, courts have created various definitions and competing frameworks for deciding a child's country of habitual residence. *E.g., Compare Mozes*, 239 F.3d at 1076–81 *with Robert v. Tesson*, 507 F.3d 981, 989–95 (6th Cir. 2007). Recently, the Fifth Circuit adopted its framework for making country of habitual residence determinations. *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir.2012). The inquiry balances the interests of the child with the intentions of the parents. *Larbie*, 690 F.3d at 310. A court's "inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id.* (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3rd Cir.2004)). When determining a child's country of habitual residence, analysis focuses on the "parents' shared intent or settled purpose regarding their child's residence." *Id.* (*quoting Nicolson v. Pappalardo*, 605 F.3d 100, 104 & n. 2 (1st Cir.2010)).

■ Here the facts indicate that both parents shared the intent that Guasaves, Sinaloa, Mexico, was their children's residence prior to removal. Petitioner clearly establishes that in 2008, Petitioner and Respondent, together, moved their children, A.B. (male), C.G.B., C.D.B., and A.B. (female), from the United States to Sinaloa, Mexico. Once there, Respondent purchased land and built a home. Further, the children were enrolled in and attended the local Mexican public schools. Moreover, Respondent left the children in Mexico with Petitioner for months at a time while he worked in the United States. Respondent argues that the children were all

born in the United States and that both parents had previously lived with the children in various states, *i.e.*, Nebraska, Iowa, and Texas; therefore, Respondent claims, the children's habitual residence is the United States. Respondent's reasoning fails as a child's country of habitual residence is determined by looking at the parents' intent or settled purpose prior to removal. *See Larbie*, 690 F.3d at 310. The parents' mutual decision to move their children to Mexico from the United States and establish roots in Guasaves, Sinaloa, Mexico, provides strong evidence of shared parental intent to make Mexico their children's country of habitual residence. Further evidence of shared parental intent and settled purpose is provided by the parents' signed written agreement, discussed *infra*, outlining Respondent's voluntary agreement to a visitation arrangement in Mexico. Based on the aforementioned, Petitioner satisfies the threshold requirement for cases arising under the Convention by establishing that the children's country of habitual residence prior to removal was the Republic of Mexico. *See Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir.2001). Furthermore, petitioner has proven by a preponderance of the evidence that when Respondent took C.G.B., C.D.B., and A.B. (female) to the United States, he removed "the child[ren] somewhere other than the

child's habitual residence." *Larbie*, 690 F.3d at 307.

### ii. *Rights of Custody*

■ Since Petitioner Bernal successfully proved that Mexico was the children's country of habitual residence, the "question becomes whether the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws." *Id.*; *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir.2004). "The Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Abbott v. Abbott*, 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010) (quoting Convention, art. 5(a)). Rights of custody arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, art. 3. Further, breach of rights of custody are determined by the law of the State in which the children were habitual residents immediately before removal. *Id.*

■ In the matter before the Court, rights of custody will be determined by the application of the laws of the Republic of Mexico.[9] First, Petitioner Bernal asserts that the parties voluntarily executed a le-

---

9. Petitioner requested that judicial notice be taken of various foreign and domestic laws. (Doc. # 22). At trial, Respondent had no objections to the request for judicial notice. Thus, the Court took judicial notice of the following foreign and domestic laws: (1) the Civil Code of the State of Sinaloa, Mexico; (2) the Code of Civil Procedure of the State of Sinaloa, Mexico; (3) the Federal Civil Code of Mexico; (4) the Hague Convention; (5) the International Child Abduction Remedies Act: (6) the Hague Convention on the Civil Aspects of International Child Abduction, Legal Analysis; and (7) the status of the United States of America and Mexico as signatories to the

Hague Convention on the Civil Aspects of International Child Abduction. Judicial notice of foreign law is appropriate in cases arising under the Convention. Convention, art. 14 (providing that "[i]n ascertaining whether there has been a wrongful removal ... the judicial ... authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.").

gally enforceable custody agreement under Article 17 of the Sinaloa Civil Code. At trial, Petitioner established that on December 16, 2010, a written agreement was executed by Petitioner Bernal and Respondent Gonzalez before a *Ministerio Publico*[10] at *Desarrollo Integral de La Familia*[11] (DIF) in Guasaves, Sinaloa, Mexico. The document was entered into evidence.[12] Ex. P–6. The document includes the signatures and thumb prints of both parties, the official seal of the *Ministerio Publico*, signatures of two attesting witnesses, and notation that both parties recited: "we want to sign an agreement, in order to settle our personal matters and this agreement will include the following." Specifically, in the document the parties agreed that Respondent would have weekend visitation with the children in Sinaloa, Mexico,[13] and pay $1500.00 Mexican pesos in weekly support. The agreement further dictates that "[i]n case of failure to comply with this agreement, each one may proceed on their own in conformance with the law." Ex. P–6. Respondent argues that the document was not a custody agreement. In support of this position Respondent points to the absence of the use of the term "custody agreement" on the face of the executed document.

To assist in proving that the document is a legally enforceable custody agreement under the laws of the Republic of Mexico, Petitioner submitted into evidence an affidavit by Mexican attorney Mariano Nunez Arreloa which explains relevant Mexican laws. Ex. P–5. When interpreting issues of foreign law, Federal Rule of Civil Procedure 44.1 allows a liberal approach to evidentiary rules, thus making Mariano Nunez Arreola's affidavit acceptable proof of Mexican laws. *Saldivar v. Rodela*, 879 F.Supp.2d 610, 621–22 (W.D.Tex.2012) (providing a thorough analysis of the application of foreign law to wrongful removal cases under the Hague Convention). Previously, the United States District Court for the Western District of Texas, El Paso Division, allowed the use of an affidavit from Mr. Arreloa to assist in determining whether rights of custody existed under the laws of the Republic of Mexico in a case arising under the Convention. *Saldivar*, 879 F.Supp.2d at 621–22. This Court will do the same.

The State of Sinaloa, Mexico, in accordance with the Sinaloa Civil Code adheres to the legal doctrine of *patria potestad.* See Sina. Civ.Code, tit. 8, ch. 1, art. 412 *et seq.;* Ex. P–5. "Pursuant to that doctrine both parents have joint custody rights." *Castro v. Martinez*, 872 F.Supp.2d 546, 555 (W.D.Tex.2012); *Saldivar*, 879 F.Supp.2d at 623–24 (providing a comprehensive discussion on *patria potestad* and the rights attributable to parents under the legal doctrine). Article 417 of the Sinaloa Civil Code details how rights of custody are determined upon parental separation. In cases of separation, parents can: (1) reach an agreement on the terms of how care and custody will be exercised over their minor children; or (2) in cases of disagreement, a judge [in the Republic of Mexico]

10. The *Ministerio Publico* present was Sonia Cervantes Vea. Ex. P–6.

11. *Desarrollo Integral de la Familia* ("Integral Family Development Agency") is an agency in Mexico charged with ensuring the welfare of minors. *See* DIF NACIONAL, http://web.dif.gob.mx/ (last visited Nov. 1, 2012).

12. Petitioner entered into evidence a copy of the agreement in Spanish and a copy translated into English by a certified translator. Ex. P–6.

13. "Mr. Gerardo Bahena Gonzalez will be able to visit with his 4 underage children on weekends either at the place he actually inhabits in Nio., Guasave, Sinaloa, and/or at his home located in ... Sinaloa, and/or a recreational center in the municipality of Guasave, Sinaloa." Ex. P–6.

will resolve the matter. Sina. Civ.Code, art. 417; Ex. P–5. Further, the minor will be under the primary care and attention of one of the parents while the other participates by exercising rights of care and visitation as per the agreement or judicial decision. *Id.* at art. 417.

Based on the aforementioned, this Court finds that the agreement executed between Petitioner and Respondent is valid under the laws of the State of Sinaloa, Mexico. Furthermore, the agreement gave Petitioner specific rights of custody as defined by the Convention. *See Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010); Convention, art. 5(a). Petitioner has proven by a preponderance of the evidence that Respondent took C.G.B., C.D.B., and A.B. (female) in breach of Petitioner's rights of custody under the laws of the children's habitual residence— the Republic of Mexico.

### iii. *Rights of custody exercised at the time of removal*

▮▮▮▮ Petitioner's final hurdle to making a prima facie case for wrongful removal of C.G.B., C.D.B. and A.B. (female) is showing that at the time of removal she was actually exercising her rights of custody or would have been exercising those rights but for the removal. *Larbie v. Larbie,* 690 F.3d 295, 307 (5th Cir.2012); Convention art. 3(b). Courts apply a liberal approach when determining whether rights of custody were actually being exercised. *Sealed Appellant v. Sealed Appellee,* 394 F.3d 338, 344–345 (5th Cir.2004) (citing *Friedrich v. Friedrich,* 78 F.3d 1060, 1065–66 (6th Cir.1996)). This approach avoids deciding merits of a custody dispute, thus, conforming with the objectives of the Convention. *Friedrich,* 78 F.3d at 1065; 42 U.S.C. § 11601(b)(4) (limiting the scope of U.S. Courts to determining "rights under the Convention and not the merits of any underlying child custody claims."). "To show failure to exercise

custody rights, the removing parent must show the other parent has abandoned the child." *Sealed Appellant,* 394 F.3d at 344– 345.

In the case before the Court, Respondent made no showing that Petitioner abandoned her children. In contrast, Petitioner clearly established that she was exercising her rights of custody under the custody agreement, discussed *supra,* and that she released her children to Respondent in compliance with the visitation arrangement defined in the agreement. No abandonment of the children occurred; therefore, Petitioner has established all three elements necessary to make a prima facie case for return of C.G.B., C.D.B., and A.B. (female) to the Republic of Mexico under the Convention. *See Larbie v. Larbie,* 690 F.3d 295, 307 (5th Cir.2012).

### C. Respondent Gonzalez' case

"When a child under the age of sixteen has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010) (quoting Convention, art. 12). The Convention sets forth five narrow affirmative defenses to return of a child wrongfully removed from the country of habitual residence. 42 U.S.C. § 11603(e)(2)(A)-(B); Convention, arts. 12, 13, 13(a), 13(b), 20. Two of the defenses must be proven by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A): the grave risk of physical or psychological harm defense, Convention, art. 13(b); and, when return would violate the "fundamental principles" relating to the "protection of human rights and fundamental freedoms" of the returning country, Convention, art. 20. The remaining three defenses must be proven by a preponderance of the evidence, 42 U.S.C.

§ 11603(e)(2)(B): when judicial proceedings were commenced one year after the date of removal and the respondent proves that the child is now settled into the new environment, Convention, art. 12; when the child objects to return and the court finds that the child has reached an age and level of maturity appropriate for the court to take into account the child's view, Convention, art. 13; and, when the petitioner seeking return of the child consented to the initial removal or later acquiesced to the removal, Convention, art. 13(a).

### i. Grave risk of physical or psychological harm

 Respondent Gonzalez pleaded and argued at trial a single affirmative defense under the Convention. Respondent asserts that there is a grave risk of physical and psychological harm if the children are returned to Petitioner. Convention, art. 13(b). A respondent who opposes the return of a child and asserts the "grave risk" affirmative defense has the burden of establishing by clear and convincing evidence "that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b). Even if a respondent establishes the grave risk exception, "a federal court has 'and should use when appropriate' the discretion to return a child to his or her place of habitual residence 'if return would further the aims of the Convention.' " *England v. England*, 234 F.3d 268, 271–72 (2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir.1996)); *see also* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503–10516, 10509 (March 26, 1986) (hereinafter "Convention Analysis") ("[A] finding that one or more of the exceptions provided by Article[s] 13 and 20 are applicable does not make refusal of a return order mandatory.... [C]ourts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies.").

In support of his "grave risk" affirmative defense, Respondent argues that the narrow exception to return of the children to Mexico applies because: (1) the ongoing cartel violence in Guasaves, Sinaloa, Mexico, poses a grave risk; and (2) Petitioner is less fit than Respondent to care for their children.

#### a. The cartel violence in Mexico

 A high threshold exists for establishing the grave risk of harm defense. *See e.g., Silverman v. Silverman*, 338 F.3d 886, 900–01 (8th Cir.2003); *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996). The respondent opposing the child's return must demonstrate "that the risk to the child is grave, not merely serious." Convention Analysis, 51 Fed.Reg. 10503–10516, 10510 (March 26, 1986). A grave risk of harm can be established when return of the child to the country of habitual residence puts the child in "immediate danger prior to resolution" of the underlying custody dispute. *Friedrich*, 78 F.3d at 1069. Examples of such immediate danger include "returning the child to a zone of war, famine, or disease." *Id.*; *Sanchez v. Sanchez*, No. SA–12–CA–568, 2012 WL 5373461, at *10–11 (W.D.Tex. Oct. 30, 2012).

 It is Respondent's position that the ongoing cartel violence in Mexico poses a grave risk to the physical safety of C.G.B., C.D.B., and A.B. (female) and that return would pose a grave risk of psychological harm by placing the children in an intolerable situation. *See* 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b). At trial, Respondent testified that cartel violence is overflowing from larger Mexican cities and directly affecting smaller towns such as Guasaves, Sinaloa, Mexico.

Respondent further testified that while visiting the children in Guasaves, he observed what appeared to be dead bodies floating in the river near their family home. Additionally, A.B. (male), the parties' 16–year-old son, who is not subject to this suit under the Convention, testified that before he was taken to the United States by his father, he was a passenger in a vehicle that was stopped by armed cartel members or thugs. A.B. (male) described witnessing a tense situation in which an armed man pointed a gun directly at the driver of the vehicle, A.B.'s (male) uncle, while A.B. (male), his grandmother, and his cousin were in the vehicle. A.B. (male) further testified that he did not believe the armed men were police, but believed they were thugs looking for people in a similar vehicle. Eventually they were allowed to leave unharmed. Petitioner testified that the village where she lives, Guasaves, is peaceful and there is no danger to the children. Petitioner further asserts that the incident experienced by A.B. (male) was a onetime occurrence likely to never recur.

The ongoing violence in the Republic of Mexico is a serious concern; however, the general cartel violence in Mexico, and specifically the testimonial evidence, *supra*, does not constitute the clear and convincing evidence necessary to trigger the grave risk of harm exception. *Castro v. Martinez*, 872 F.Supp.2d 546, 556–58 (W.D.Tex.2012) (denying respondent's grave risk of harm defense and asserting that Mexico's drug cartel activities do not satisfy an exception to the return of a child under the Convention); *Vazquez v. Estrada*, No. 3:10–CV–2519, 2011 WL 196164 (N.D.Tex. Jan. 19, 2011) (returning child to habitual residence in Mexico and denying removing parent's argument that cartel drug violence in Monterrey posed a grave risk or intolerable situation under the Convention); *Avendano v. Smith*, 806 F.Supp.2d 1149, 1176 (D.N.M. Aug. 19, 2011) ("Although Mexico is more dangerous than the United States at this time, intolerable situation was not meant to encompass return to a home where living conditions are less palatable."). Moreover, courts have refused to extend the grave risk of harm exception to cases in which return of a child was to a country facing similarly violent sociopolitical disruptions as those currently confronting the citizens of the Republic of Mexico. *See e.g., Silverman v. Silverman*, 338 F.3d 886, 900–01 (8th Cir.2003); *Mendez Lynch v. Mendez Lynch*, 220 F.Supp.2d 1347, 1365–66 (M.D.Fla.2002). In *Silverman*, the general regional violence in Israel, "such as suicide bombers," was not sufficient to establish a "zone of war" for purposes of the grave risk of physical or psychological harm exception under the Convention. *Silverman*, 338 F.3d at 901; *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir.1996). Also, the extreme sociopolitical unrest in Argentina did not qualify as a "zone of war" to halt the return of a child under the Convention. *Mendez Lynch*, 220 F.Supp.2d at 1365–66.

The grave risk of harm defense focuses on whether return of the child to the country of habitual residence would place the child "in immediate danger *prior* to resolution" of the parents' child custody dispute. *Friedrich*, 78 F.3d at 1069 (emphasis in original). Here, Respondent demonstrated that the ongoing violence in Mexico poses serious risk: however, Respondent failed to show that the risk to the children is grave. Convention Analysis, 51 Fed. Reg. 10503–10516, 10510 (March 26, 1986). Furthermore, Respondent failed to show that the conditions in Guasaves, Sinaloa, Mexico; equate to a "zone of war, famine, or disease." *Friedrich*, 78 F.3d at 1069. Thus, Respondent's grave risk of harm defense based on the cartel violence in Mexico is denied.

### b. General allegations that Petitioner is less fit than Respondent to care for their children

The grave risk of harm defense may trigger an exception to return of a child to the country of habitual residence "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Id.; see* Convention, art 13(b). In *Walsh v. Walsh,* 221 F.3d 204, 218 (1st Cir.2000), the following standard was used for an Article 13(b) defense based on abuse:

> The text of the article requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. *See Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 377 (8th Cir.1995). Not any harm will do nor may the level of risk of harm be low. The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention.

*Walsh,* 221 F.3d at 218 (citations omitted). To restate, the primary function of the return remedy under the Convention is to "not alter the pre-abduction allocation of custody rights ... leav[ing] custodial decisions to the courts of the country of habitual residence." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010) (citing Convention, art. 19). U.S. courts are limited to deciding "rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4).

■■■ Respondent presented evidence that Petitioner possibly over-consumed alcohol; possibly entertained late night visits by men seeking money; failed to provide a clean house for the children; did not have employment; failed to provide the children with properly fitting clothing and shoes with money supplied by Respondent; and failed to rid the children of lice infestation. In contrast, Respondent asserted that he has a full-time job; has always financially supported the children; provides a clean home; takes the children to the dentist; got the children immunized in the United States; and successfully addressed the children's lice infestation. At trial, much was made over an incident in which A.B. (female) was stung by a scorpion at approximately 10:00 p.m., while staying at her grandparents' home. The child was rushed to the local hospital for treatment. Petitioner could not be immediately located, however, Petitioner testified that once she learned of the scorpion incident she went to the hospital and found that A.B. (female) had already been released.

Although the evidence presented does not paint Petitioner in a pleasant light, Respondent failed to present any evidence of serious neglect or abuse to satisfy the grave risk of harm exception. *See Friedrich v. Friedrich,* 78 F.3d 1060, 1069 (6th Cir.1996); *see also Sanchez v. Sanchez,* No. 12–CA–568, 2012 WL 5373461, at *10–11 (W.D.Tex. Oct. 30, 2012) (evidence of past domestic violence or past drug activity in the home was not enough to reach the grave risk exception). Further, A.B.'s (male) testimony did not indicate any abuse, neglect, or denial of access to school. Without a clear showing of abuse or neglect an award of the grave risk of harm exception based on the various domestic issues raised by Respondent would contradict the Convention's primary goals of "restor[ing] the pre-abduction status quo and ... deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (*quoting Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir.1996)). Furthermore, the grave risk of harm defense was not intended to be used by a respondent as a vehicle to

litigate the child's best interests. Convention Analysis, 51 Fed.Reg. 10503–10516, 10510 (March 26, 1986). Any debate regarding whether Respondent is more fit to be the primary caretaker of C.G.B., C.D.B., and A.B. (female) must take place in the Republic of Mexico. *See* Elisa Pérez–Vera Explanatory Report ¶ 19 at 430. Therefore, Petitioner has failed to establish by clear and convincing evidence that return of the children would pose a grave risk of physical or psychological harm or an intolerable situation under the Convention. *See* 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b).

### ii. Well settled into new environment

 When a petition for return of child is commenced in a court after one year from the date of removal, the respondent can assert an affirmative defense and prevent removal back to the country of habitual residence if respondent proves by a preponderance of the evidence that the child is now settled into the new environment. 42 U.S.C. § 11603(e)(2)(B); Convention, art. 12. Here, C.G.B., C.D.B., and A.B. (female) were removed from their country of habitual residence, the Republic of Mexico, on or about March 25, 2011. Petitioner did not file suit in the Western District of Texas, Midland/Odessa Division, for return of the children until August 27, 2012. Petitioner's suit for return of children under the Convention was filed approximately five months after the deadline. However, Respondent never raised the settled into new environment affirmative defense. Convention, art. 12. It was not raised in his answer, supplemental briefing, post-trial briefing, or at trial. The provision of the Convention relevant to this discussion states:

Article 12: When a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, *unless it is demonstrated* that the child is now settled in its new environment.

Convention, art. 12 (emphasis added). Petitioner urges this Court to treat the Article 12 affirmative defense as waived because Respondent never asserted the defense. *See* Fed.R.Civ.P. 8(c)(1) (requiring parties to plead affirmative defenses). "It is true that failure to abide by Rule(8)(c) leads to waiver, [however] there is some play in the joints." *Rogers v. McDorman,* 521 F.3d 381, 385 (5th Cir. 2008). A plaintiff must be given fair notice that a defense is being asserted through pleadings that give enough specificity and factual particularity to identify the defense pleaded. *Rogers,* 521 F.3d at 385 (citing *Woodfield v. Bowman,* 193 F.3d 354, 362 (5th Cir.1999)). "[A] defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense." *Ingraham v. United States,* 808 F.2d 1075, 1079 (5th Cir. 1987) (citations omitted). A technical failure to plead an affirmative defense in compliance with Federal Rules of Civil Procedure 8(c), however, does not fatally destroy a proponent's ability to raise the affirmative defense if it is raised in the trial court in a way that does not result in unfair surprise. *Rogers,* 521 F.3d at 385–86 (citing *Allied Chem. Corp. v. Mackay,* 695 F.2d 854, 855–56 (5th Cir.1983) (per curiam)). "[A] defendant does not waive an affirmative defense if it is raised at a 'pragmatically sufficient time, and [the

plaintiff] was not prejudiced in its ability to respond.'" *Id.* (quoting *Arismendez v. Nightingale Home Health Care, Inc.,* 493 F.3d 602, 610 (5th Cir.2007) (changes in original)).

Petitioner was never *per se* ambushed by an Article 12 settled into new environment defense because Respondent never raised the defense at any time over the course of the proceedings. However, Petitioner was well aware of the potential for an Article 12 affirmative defense based on the delayed filing of Petitioner's Verified Petition for Return of Children. In a diligent exercise of caution, Petitioner asserts that if this Court chooses to address the settled into new environment affirmative defense, then Respondent failed to establish by a preponderance of the evidence that C.G.B., C.D.B., and A.B. (female) are settled into their new environment for reasons Petitioner specifically argues, summarized *infra* at page 926. (Doc. # 36 at 14–15).

The Elisa Pérez–Vera Report provides mixed guidance on who has the responsibility for asserting the settled into new environment affirmative defense. Elisa Pérez–Vera Explanatory Report ¶ 109 at 459.

> [A]n obligation [to return the child] disappears whenever it can be shown that the child is now settled in its new environment. The provision does not state how this fact is to be proved, but it would seem logical to regard such a task as falling upon the abductor or upon the person who opposes the return of the child, *whilst at the same time preserving*

*the contingent discretionary power of internal authorities in this regard.*

*Id.* (emphasis added). In contrast, the Department of State's guidance acknowledges that the Convention does not state how an Article 12 defense is to be proven, but promotes an approach that places the task on the one opposing the return. Convention Analysis, 51 Fed.Reg. 10503–10516, 10509 (March 26, 1986). The text specifically discussing the Department of State's position on who has the responsibility to assert that the child is now settled into the new environment quotes the same portion of the Elisa Pérez–Vera Explanatory Report ¶ 109 at 459, quoted in full *supra;* however, the Department of State omits the subsequent language: "whilst at the same time preserving the contingent discretionary power of internal authorities in this regard." *See id.* Based on these inconsistencies and overall lack of guidance from caselaw on the matter, this Court will exercise its "contingent discretionary power" and examine Respondent's potential settled into new environment affirmative defense under Article 12 of the Convention.[14] *Compare* Elisa Pérez–Vera Explanatory Report ¶ 109 at 459 *with* Convention Analysis, 51 Fed.Reg. 10503–10516, 10509 (March 26, 1986). However, this Court is mindful that by exercising its "contingent discretionary power" and examining Respondent's unpleaded Article 12 affirmative defense, Petitioner may be prejudiced by her inability to respond and assert a potentially viable equitable tolling defense, available to petitioners that fail to meet the one-year filing deadline under the Convention.[15] *Rogers v. McDorman,*

---

**14.** Moreover, the Department of State's own analysis promotes the Elisa Pérez–Vera Report as the official explanatory source on Convention matters, thus giving further support to the Court's decision to apply the Elisa Pérez–Vera Report's guidance. Convention Analysis, 51 Fed.Reg. 10494, 10503 (1986) (citing the Elisa Pérez–Vera Report and de-

scribing it as being "recognized by the Conference as the official history and commentary on the Convention.").

**15.** Further complicating matters is Petitioner's potentially viable equitable tolling defense, not asserted because Respondent never pleaded or raised the Article 12 affirmative

521 F.3d 381, 385–86 (5th Cir.2008); *Dietz v. Dietz*, 349 Fed.Appx. 930, 932–33 (5th Cir.2009) (not selected for publication) (adopting equitable tolling); *Ibarra v. Quintanilla Garcia*, 476 F.Supp.2d 630, 635 (S.D.Tex.2007) (equitably tolling the one-year filing deadline by approximately five months). Furthermore, Respondent's failure to assert the Article 12 affirmative defense does not lessen Respondent's burden of proof under ICARA. 42 U.S.C. § 11603(e)(2)(B). The relevance of the inconsistencies between the Elisa Pérez–Vera Explanatory Report and the Department of State's Convention Analysis is limited to the procedural element of "how this

fact is to be proved" when asserting an Article 12 affirmative defense, specifically whether Respondent must assert the affirmative defense or whether the Court can use "contingent discretionary power[s]" to examine whether an Article 12 affirmative defense has been established by Respondent. *See* Elisa Pérez–Vera Explanatory Report ¶ 109 at 459; Convention Analysis, 51 Fed.Reg. 10503–10516, 10509 (March 26, 1986). Respondent's burden of proof is not in issue. ICARA makes clear that Respondent must prove by a preponderance of the evidence that the children are settled into the new environment. 42 U.S.C. § 11603(e)(2)(B).

defense under the Convention, thus prejudicing Petitioner's ability to respond. *See Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008). A court may equitably toll the one-year period where two related conditions are met: (1) the abducting parent concealed the child; and (2) the concealment caused the petitioner's filing delay. *Edoho v. Edoho*, No. H–10–1881, 2010 WL 3257480, at *7 (S.D.Tex. Aug. 17, 2010) (citing *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir.2009)). In *Dietz v. Dietz*, 349 Fed.Appx. 930 (5th Cir.2009) (not selected for publication) equitable tolling was applied when a child was removed from Mexico without the consent of the custodial parent and taken to an unknown location. There is no mention of equitable tolling in the Convention or in ICARA; however, the concept has been developed in caselaw. *See, e.g., Duarte v. Bardales,* 526 F.3d 563, 569–70 (9th Cir.2008) (adopting equitable tolling under the "Hague Convention and ICARA because applying equitable principles to toll the one-year filing period in circumstances where the abducting parent hides the child is consistent with the purpose of the Convention to deter child abduction."); *Furnes v. Reeves,* 362 F.3d 702, 723–24 (11th Cir.2004); *Van Driessche v. Esezeoboh,* 466 F.Supp.2d 828, 850 (S.D.Tex.2006). In *Dietz* the district court applied equitable tolling and allowed the one-year filing requirement to be tolled because despite attempts to locate her child, petitioner did not definitely know where her child was until approximately three months after removal, thus making her filing for judicial relief outside of the one-year filing

deadline deemed timely. *Dietz,* 349 Fed. Appx. at 933. On appeal, the equitable tolling calculation was upheld. *Id.*

In the instant case, similar facts for the assertion of an equitable tolling defense exist. Respondent removed the children from Guasaves, Sinaloa, Mexico, on or about March 25, 2011; first, to San Diego, California; then, to Nebraska; and finally, to Crane, Texas, where they currently reside. The exact dates Petitioner learned where her children were located were disputed at trial. Most importantly, trial testimony revealed that Petitioner knew fairly promptly that her children were in Nebraska through communication with her aunt, but was unaware that the children had been relocated to Crane, Texas. Petitioner learned of the move to Crane, Texas, only after it occurred and through a conversation with her niece. Petitioner might have made a convincing equitable tolling argument based on the secretive relocation to Crane, Texas, by showing (1) the abducting parent concealed the child; and (2) the concealment caused the petitioner's filing delay. *Edoho v. Edoho,* No. H–10–1881, 2010 WL 3257480, at *6 (S.D.Tex. Aug. 17, 2010) (citing *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir.2009)). This Court makes no determination of the merits of such a defense and only explores the possible equitable tolling defense to show that Petitioner experienced a level of prejudice by Respondent's failure to assert the Article 12 affirmative defense under the Convention. *See Rogers v. McDorman,* 521 F.3d 381, 385 (5th Cir.2008); Convention, art. 12.

The Fifth Circuit has not addressed the standard for determining whether a child is settled into a new environment for purposes of the Article 12 affirmative defense. In *Edoho v. Edoho,* No. H–10–1881, 2010 WL 3257480, at *6 (S.D.Tex. Aug. 17, 2010), the district court applied the "settled into new environment" analysis used by the Ninth Circuit.

> In determining whether a child is settled within the meaning of Article 12, we consider a number of factors that bear on whether the child has "significant connections to the new country." These factors include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability. In some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of deportation. Although all of these factors, when applicable, may be considered in the "settled" analysis, ordinarily the most important is the length and stability of the child's residence in the new environment.

*Edoho,* 2010 WL 3257480, at *6 (quoting *In re B. Del C.S.B.,* 559 F.3d 999, 1009 (9th Cir.2009)); *Lozano v. Alvarez,* 697 F.3d 41, 56–57 (2nd Cir.2012) (applying a similar list of considerations for determining the settled into new environment defense). Further guidance is provided by the Department of State's commentary: "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof." Convention Analysis, 51 Fed.Reg. 10503–10516, 10509 (March 26, 1986).

Although not subject to return to Mexico under the Convention, A.B. (male), the parties' 16–year–old son's testimony provides some relevant information in determining whether C.G.B., C.D.B., and A.B. (female) are settled into their new environment. *See In re B. Del C.S.B.,* 559 F.3d 999, 1009 (9th Cir.2009); *see also Duarte v. Bardales,* 526 F.3d 563 (9th Cir.2008) (Bea, J. dissenting) (announcing the well settled factors) (citing *Lops v. Lops,* 140 F.3d 927, 945–46 (11th Cir.1998)). A.B. (male) testified to moving many times over the course of his life. His moves include two relocations to Guasaves, Sinaloa, Mexico, from the United States, and many moves between states within the United States. Specifically, A.B. (male) testified to the following: (1) being born in California; (2) moving to Mexico shortly after his birth and living in Mexico until he was approximately six years old; (3) moving back to the United States, specifically to Nebraska; (4) moving from Nebraska to Iowa and back to Nebraska; (5) moving from Nebraska to Odessa, Texas; (6) moving back to Guasaves, Sinaloa, Mexico, approximately four years ago in 2008, with his entire family; (7) moving back to Nebraska after being removed by his father; and (8) moving from Nebraska to Crane, Texas, where he currently lives with his father and three siblings. A.B.'s (male) testimony reveals that C.G.B., C.D.B., and A.B. (female) also participated in each move occurring after their respective births. Additionally, he testified that he and all of his siblings: ten-year-old twins C.G.B. and C.D.B., and five-year-old A.B. (female), attend school in Crane, Texas. A.B. (male) is on his school's basketball team. Further testimony revealed that there are no relatives located in Crane, Texas, while a large extended family comprised of grandparents, uncles, cousins, and close friends live in and around Guasaves, Sinaloa, Mexico.

A.B. (male) believes that he and his siblings have been residing in Crane, Texas, since late summer or early fall of 2011. Also of note to this discussion, Respondent testified that he is employed as a welder.

In support of Petitioner's assertion that Respondent failed to establish by a preponderance of the evidence that C.G.B., C.D.B., and A.B. (female) are settled into their new environment, Petitioner argues that the only evidence Respondent presented in favor of the settled into new environment 'defense is that the children are enrolled in school; [16] that C.G.B. and C.D.B. currently attend English as a Second Language classes in Crane, Texas, thus establishing that the children are not yet settled and integrated into their new environment; and that A.B.'s (male) testimony that the children have no family in the community besides their father undermines one of the elements used to consider whether the children are settled in the new environment. *See In re B. Del C.S.B.*, 559

F.3d at 1009 (listing factors to consider in the settled analysis, and specifically applying whether the children have relatives in the new environment); *Edoho v. Edoho*, No. H–10–1881, 2010 WL 3257480, at *6 (S.D.Tex. Aug. 17, 2010).

Although Respondent presents testimony by A.B. (male) that addresses many of the factors outlined in the settled into new environment inquiry developed by the Ninth Circuit, Respondent fails to connect A.B.'s (male) testimony to those directly affected by this suit and subject to removal under the Convention—C.G.B., C.D.B., and A.B. (female). A.B.'s (male) testimony shows that C.G.B., C.D.B., and A.B. (female) are currently in school, have moved frequently throughout the United States and back-and-forth to Mexico, and have no relatives in Crane, Texas, other than their father (Respondent). Importantly, Respondent failed to elicit, by testimony or through the submission of evidence at trial,[17] the exact amount of time that C.G.B.,

---

**16.** Petitioner's position is supported by Respondent's Affidavits of Business and School Records for C.G.B, C.D.B., and A.B. (female). *See infra* note 17.

**17.** Following the bench trial, the Court ordered the submission of "supplemental briefing on any matter relevant to the disposition of this case by ... October 17, 2012." (Doc. # 34). Both parties complied. (Doc. # 36 & Doc. # 37). Respondent's brief failed to raise any additional issues, such as the Article 12 affirmative defense, and generally restated arguments made at trial. (Doc. # 37). Then, on October 18, 2012, a day after the supplemental briefing deadline, Respondent filed a Motion to Seal Court Records seeking to seal Affidavits of Business Records and School Records. (Doc. # 38). In his Motion to Seal, Respondent included three Affidavits of Business Records from the school in Crane, Texas, where the children are currently enrolled. (Doc. # 38–1). This was the first time the Court had viewed any Affidavit's of Business Records from Respondent. Prior to trial, on October 3, 2012, the undersigned entered a Discovery and Scheduling Order requiring the parties to "submit affidavits and exhibits

intended to be used at the hearing ... with a designation as to whether each exhibit is agreed upon by the parties or objected to by either party." (Doc. # 21). Respondent's Exhibit List included a list of three Affidavits of Business Records: (1) Affidavit of Business Records of C.D.B.; (2) Affidavit of Business Records of A.B. (female); and (3) Affidavit of Business Record of C.G.B. (*Id.*). Respondent's Exhibit List did not indicate whether Petitioner objected or consented to the introduction of the three affidavits. (*Id.*). Further, Respondent did not attach the three affidavits as required under the Discovery and Scheduling Order. (Doc. # 38). Additionally, Respondent did not attempt to introduce the Affidavit's of Business Records into evidence at the bench trial.

On November 15, 2012, the Court issued an Order for Clarification in response to Respondent's Motion to Seal the Affidavits of Business Records and School Records. (Doc. # 47). The Court inquired whether Respondent was requesting "that these three Affidavits of Business Records be considered as evidence in the Court's final determination on Petitioner's Petition for Return of Children."

C.D.B., and A.B. (female) have lived in Crane, Texas.[18] *See Edoho*, 2010 WL 3257480, at *6. The most important factors when considering the settled into new environment is the length of time in the new residence and the stability of that environment. *In re B. Del C.S.B.*, 559 F.3d at 1009. Respondent's failure to present the exact dates at trial that the children have resided in Crane, Texas, coupled with A.B.'s (male) testimony of frequent moves and lack of relatives, raises serious doubts as to the stability of the new environment. *Id.; Edoho*, 2010 WL 3257480, at *6.

Through the exercise of this Court's "contingent discretionary power" to examine Respondent's settled into new environment affirmative defense under Article 12 of the Convention, and after due consideration of the complaint, testimony, exhibits, briefing, evidence, and all arguments made, this Court finds that Respondent has failed to meet his burden to prove by a preponderance of the evidence that C.G.B., C.D.B., and A.B. (female) are settled into the new environment. 42 U.S.C. § 11603(e)(2)(B); Elisa Pérez–Vera Explanatory Report ¶ 109 at 459. "[N]othing less than substantial evidence of the child's

significant connections to the new country is intended to suffice to meet the respondent's burden of proof." Convention Analysis, 51 Fed.Reg. 10503–10516, 10509 (March 26, 1986). Here, substantial evidence has not been presented to this Court to prove by a preponderance of evidence that C.G.B., C.D.B., and A.B. (female) are now settled into Crane, Texas; thus, there is no exception to return under the Convention. *See* 42 U.S.C. § 11603(e)(2)(B).

### iii. Respondent's default judgment divorce in Texas and award of sole managing custody

 Respondent asserts that a default judgment divorce, entered by a Texas court on July 26, 2012, in which the Court awarded Respondent sole managing custody over the children is a defense to the return of C.G.B., C.D.B., and A.B. (female) to their country of habitual residence—the Republic of Mexico. The Convention provides that state court actions "shall not decide . . . the merits of rights of custody until it has been determined that the child is not to be returned" to the country of habitual residence in cases of wrongful removal under the Convention. *Castro v.*

---

*(Id.).* Parties were given short deadlines to respond with briefing and both timely responded. (Doc. # 43 & Doc.# 44). On November 28, 2012, the Court issued an Order Granting Respondent's Request that Affidavit's of Business Records be Considered in the Court's Final Determination of Petitioner's Verified Petition for Return of Children. (Doc. # 47).

The Affidavits of Business Records and School Records of A.B. (female), C.D.B., and C.G.B. establish that all of the children started school in Crane, Texas, in the fall semester of 2011 and currently attend school in Crane, Texas. In sum the three children have attended the last three semesters of school dating back to the fall semester of 2011. Further, the records reveal that each child has great attendance and solid grades. This Court finds that the Affidavits of Business Record and School Records are evidence cor-

roborating A.B.'s (male) testimony that all of his siblings have been attending school in Crane, Texas, since the fall semester of 2011, and are currently attending school. Additionally, the evidence shows that the children have done well in school. This Court will not give any more weight to the Affidavits of Business Records and School Records submitted post-trial. Further consideration and development would clearly prejudice Petitioner's ability to respond as she has been afforded no opportunity to object in open court and no ability to develop testimony based on these affidavits through cross-examination or rebuttal witnesses. (Doc. # 44).

**18.** The Affidavits of Business Records and School Records provide an inference that A.B., C.D.B., and C.G.B. were in Crane, Texas, by the start of the Crane public school's fall semester of 2011.

*Martinez,* 872 F.Supp.2d 546, 552–53 (W.D.Tex.2012); Convention. art. 16. Furthermore, ICARA expressly prohibits a court from deciding the underlying merits of a custody dispute. 42 U.S.C. § 11601(b)(4); *England v. England,* 234 F.3d 268, 271 (5th Cir.2000). "Under Article 17, that State cannot refuse to return a child solely on the basis of a court order awarding custody to the alleged wrongdoer made by one of its own courts or by the courts of another country." *Castro,* 872 F.Supp.2d at 552 (quoting Convention Analysis, 51 Fed.Reg. 10503–10516, 10504 (March 26, 1986)). Moreover, allowing a state's custody decision to prevent the return of children wrongfully removed from their country of habitual residence would be in direct contravention of the Convention and ICARA's primary goal of "deter[ring] parents from crossing borders in search of a more sympathetic court." *England,* 234 F.3d at 271 (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir.1996)). Most significantly, this Court's determination that C.G.B., C.D.B., and A.B. (female) were wrongfully removed form their country of habitual residence under the Convention preempts the default judgment in state court that awarded sole managing custody. *Saldivar v. Rodela,* 879 F.Supp.2d 610, 631 (W.D.Tex.2012) ("[A]n order issued by this Court pursuant to the Convention and ICARA preempts a conflicting state court order or judgment issued pursuant to state law."). Clearly, Respondent's award of sole managing custody under the laws of Texas is no defense to the return C.G.B., C.D.B., and A.B. (female) to the Republic of Mexico. 42 U.S.C. § 11601(b)(4); *England,* 234 F.3d at 271; *Castro,* 872 F.Supp.2d at 552–53; *see also Saldivar,* 879 F.Supp.2d at 631–32; Convention, art. 17. The Texas court did not have the authority to decide the custody of the children and assign Respondent sole managing custody while the suit

for return of children under the Convention was pending. Convention, art. 16.

## D. Attorney Fees and Costs

■■■ Petitioner Bernal has requested attorney fees and costs, including transportation expenses pursuant to Article 26 of the Convention and 42 U.S.C. § 11607(b). Petitioner Bernal has not, to date, submitted proof of costs for transportation, expenses, or legal fees. In a case arising under the Convention, ICARA requires that "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster homes or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). It is the respondent's burden to show that an award of attorney's fees, expenses, and costs would be "clearly inappropriate." *Saldivar v. Rodela,* 879 F.Supp.2d 610, 631–32 (W.D.Tex.2012) (quoting *Whallon v. Lynn,* 356 F.3d 138, 140 (1st Cir.2004)); *see also Saldivar v. Rodela,* 894 F.Supp.2d 916 (W.D.Tex.2012).

### Conclusions Of Law

In accordance with Article 3 of the Convention and the International Child Custody Abduction Remedies Act, Petitioner has proven by a preponderance of the evidence that C.G.B., C.D.B., and A.B. (female) were wrongfully removed from their country of habitual residence. Petitioner had rights of custody under the laws of the Republic of Mexico, the State in which the children were habitual residents immediately before removal, and Petitioner was exercising those rights before removal.

Respondent's removal of C.G.B., C.D.B., and A.B. (female) clearly breached Petitioner's rights of custody.

In accordance with Article 13 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish by clear and convincing evidence that there is a grave risk that return of C.G.B., C.D.B., and A.B. (female) would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation.

In accordance with Article 12 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to plead and establish by a preponderance of the evidence that C.G.B., C.D.B., and A.B. (female) are now settled in their new environment.

In accordance with Articles 16 and 17 of the Convention, the decision of the Texas court to award Respondent sole managing custody over the children is not a defense to returning C.G.B., C.D.B., and A.B. (female) to their country of habitual residence-the Republic of Mexico.

A primary objective of the Convention is to ensure that rights of custody established in one country are respected by the country where the children have been taken. Convention, art. 1. This Court finds that Petitioner Bernal and Respondent Gonzalez executed a legally enforceable custody agreement under the laws of the Republic of Mexico, the children's country of habitual residence, giving Petitioner rights of custody. Respondent took the children to the United States without Petitioner's consent or acquiescence, thus breaching her rights of custody under the laws of the Republic of Mexico. Petitioner was exercising rights of custody before the removal, thus the taking of the children was wrongful and return is the appropriate remedy. The Court further finds that no affirmative defenses were proven to halt the return of the children.

All parties agree that this is a difficult case. Respondent had rational reasons for taking his children from Guasaves, Sinaloa, Mexico, to the United States; however, this Court is limited to deciding rights under the Convention and not the merits of the underlying child custody claim. *See* 42 U.S.C § 11601(b)(4). Courts do not apply the best interest of the child standard when determining whether return of children to their country of habitual residence is appropriate. Nothing decided in these proceedings prejudices Respondent Gonzalez' ability to file suit in the Republic of Mexico for custody of C.G.B., C.D.B., and A.B. (female). The Convention and ICARA "deter[s] parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir. 1996)). Thus, "leav[ing] custodial decisions to the courts of the country of habitual residence." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010); Convention, art. 19. The parties' custody agreement dictates that "[i]n case of failure to comply with this agreement, each one may proceed on their own in conformance with the law." Ex. P–6. Respondent, if he so chooses, may pursue custody of C.G.B., C.D.B., and A.B. (female) in the courts of the Republic of Mexico.

### JUDGMENT

Based on the aforementioned, this Court finds that C.G.B., C.D.B., and A.B.'s (female) habitual residence is the Republic of Mexico and that the children were wrongfully removed to the United States in violation of the Convention. Petitioner Amelia Aguilar Bernal's Verified Petition for Return of Children is **GRANTED.**

**IT IS HEREBY ORDERED** that C.G.B., C.D.B., and A.B. (female) shall be immediately returned to the custody of Petitioner Bernal.

**IT IS HEREBY ORDERED** that Respondent Gonzalez pay all necessary expenses and attorney fees pursuant to 42 U.S.C. § 11607(b)(3). The award of attorney fees and costs under 42 U.S.C § 11607(b)(3) is contingent on Petitioner filing, within fourteen (14) days of this Order, an itemization of all costs requested and a brief detailing the services rendered. Respondent Gonzalez shall have seven (7) days from date of service of Petitioner's itemization and brief to file a brief in response, asserting why the requested award is "clearly inappropriate." Based on the aforementioned, this Court will determine the appropriate monetary award of attorney fees and costs.

**IT IS FURTHER ORDERED** that the Court retains jurisdiction over this case to permit any modification or enforcement of the Order.

It is so **ORDERED.**